Lydia **LEWIS**, etc., et alia, Plaintiffs,

v.

William **GRINKER**, etc., et alia, Defendants.

No. CV–79–1740–CPS.

United States District Court, E.D. New York.

Jan. 19, 2000.

---

Richard Elliot Blum, Scott A. Rosenberg, The Legal Aid Society Civil Appeal & Law Reform Unit, New York City, for Plaintiff.

Joan Weiner Margiotta, Corporation Counsel of the City of New York, New York City, Mary Fisher Bernet, Attorney General, State of New York, for Defendants.

## MEMORANDUM AND ORDER

SIFTON, Chief Judge.

On March 14, 1991, this Court entered a permanent injunction in this class action enjoining the defendants from denying Medicaid coverage for prenatal care to otherwise eligible pregnant aliens on the ground that they were not permanently residing in the United States under color of law. *Lewis v. Grinker*, 794 F.Supp. 1193 (E.D.N.Y.1991), *aff'd, and reh'g denied*, 965 F.2d 1206 (2d Cir.1992). Those decisions held that the language of the federal Medicaid statute then at issue, which limited Medicaid coverage for undocumented aliens, should not be interpreted as applying to the provision of Medicaid benefits for prenatal care in the absence of clear evidence of Congress' intent to deny coverage for such benefits.

This action is once again before this Court on the federal defendant's motion to vacate the permanent injunction. The federal defendant contends that the permanent injunction must be vacated because Congress has now provided evidence of its specific intent to deny Medicaid coverage for prenatal care to undocumented aliens through its enactment of Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (the "Welfare Reform Act"), Pub.L. No. 104–193, 110 Stat. 2105, 2260.

For the reasons set forth below, the federal defendant's motion to vacate the permanent injunction is denied. What follows sets forth the findings of fact and conclusions of law on which this determination is based.

### BACKGROUND

#### *Statutory Framework*

Medicaid was originally enacted in 1965 as Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.* The Second Circuit has described Medicaid as a "cooperative federal/state cost-sharing program designed to enable participating states to furnish medical assistance to persons whose income and resources are insufficient to meet the costs of necessary medical care and services." *DeJesus v. Perales*, 770 F.2d 316, 318 (2d Cir.1985).

States that choose to participate in the Medicaid program are subject to the requirements of the applicable federal statutes, *see* 42 U.S.C. § 1396a, and to the regulations promulgated by the Secretary of the Department of Health and Human Services (the "Secretary") pursuant thereto.

The Medicaid statute requires participating states to provide coverage to two basic categories of individuals: the "categorically needy," 42 U.S.C. § 1396a(a)(10)(A), and the "medically needy," *id.* § 1396a(a)(10)(C). *See also* 42 C.F.R. § 435.4; *DeJesus,* 770 F.2d at 318.[1] "Roughly speaking, the categorically needy are those who earn no more than that necessary to cover the necessities of life; the medically needy differ in that it is only the expense of necessary medical care that strains their ability to pay for basic necessities." *Lewis v. Gross,* 663 F.Supp. 1164, 1174 (E.D.N.Y.1986).

### Prenatal Care Under Medicaid

Under current law, pregnant women seeking prenatal care may be eligible for Medicaid under any one of three categories, depending on their financial status. First, participating states must provide Medicaid coverage to a subgroup of the categorically needy, called the "mandatory categorically needy." 42 U.S.C. § 1396a(a)(10)(A)(i) (West Supp.1999). Included in this subgroup are "qualified pregnant women," *id.* § 1396a(a)(10)(A)(i)(III), defined as any woman with a "medically verified" pregnancy whose household would have been eligible for benefits under the Aid to Families with Dependent Children ("AFDC") program "if her child had been born and was living with her in the month such aid would be paid," or who "meets the income and resource requirements" of the AFDC program, as in effect as of July 16, 1996.[2] 42 U.S.C. § 1396d(n)(1)(A), (C).

Second, participating states may, at their option, choose to provide Medicaid coverage to individuals called the "optional categorically needy." 42 U.S.C. §§ 1396a(a)(10)(A)(ii), 1396a(d). This subgroup includes "pregnant women" in general, *id.* § 1396d(a)(viii), and "women during pregnancy" whose household incomes are between 133% and 185% of the federal poverty line, *id.* § 1396a(*l*)(1)(A), (2)(A).[3]

Third, the states may, at their option, choose to provide coverage to "medically needy" individuals. *Id.* § 1396a(a)(10)(C). This subgroup includes the same groups of individuals that the states may cover as "optional categorically needy" but applies less stringent financial and resource requirements. While medically needy coverage is generally optional with the states, once a state chooses to provide any type of medical coverage to some medically needy individuals, it must provide, *inter alia,* prenatal and delivery services to medically needy pregnant women. *Id.* §§ 1396a(a)(10)(C)(ii)–(iii), 1396d(a)(viii).

Prior to 1981, pregnant women were not identified as a special eligibility group un-

---

1. New York State joined the Medicaid program in 1966, authorizing the New York State Department of Social Services to establish a Medicaid plan covering both the categorically and the medically needy. *See* 1966 N.Y.Laws, ch. 256 (codified as amended at N.Y.Soc.Serv. Law §§ 363 *et seq.*); *see also DeJesus,* 770 F.2d at 319.

2. Section 103(a)(1) of the Welfare Reform Act repealed the AFDC program previously set forth in Part A of Title IV to the Social Security Act, 42 U.S.C. §§ 601 *et seq.,* and replaced it with a series of block grants to the states. *See* Welfare Reform Act § 103(a), 110 Stat. at 2112–13 (codified as amended at 42 U.S.C.

§§ 601 *et seq.*). The Welfare Reform Act, however, preserved the link between Medicaid eligibility and the eligibility standards that had existed under the old AFDC program as in effect as of July 16, 1996. *See* Welfare Reform Act § 114(a)(2), 110 Stat. at 2177 (codified at 42 U.S.C. § 1396u–1).

3. Women in this category receive coverage only for services related to pregnancy (including prenatal, delivery, postpartum, and family planning services) and "other conditions which may complicate pregnancy." 42 U.S.C. § 1396a(a)(10) (concluding paragraph, exception (VII)).

der the Medicaid statute.[4] Instead, the Secretary gave participating states the option to extend Medicaid benefits directly to the fetus under the assumption that fetuses were optional categorically needy "persons under the age of 21." *See Lewis v. Grinker,* 965 F.2d 1206, 1209 (2d Cir.1992) (*"Lewis IV–A"*).[5]

In the 1980's, Congress adopted a series of laws that greatly expanded access to prenatal care while at the same time shifting the analytical focus from the fetus to the pregnant mother. In the Omnibus Budget Reconciliation Act of 1981 ("OBRA '81"), Pub.L. No. 97–35, 95 Stat. 357, 853, in place of direct AFDC coverage for the fetus, Congress permitted the states to provide AFDC benefits to women in their third trimester of pregnancy if they would be eligible for AFDC based on the constructive birth of their fetuses—if they would be eligible had their children been born and living with them at the time the benefits were provided. OBRA '81, § 2312(a), 95 Stat. 357, 853. OBRA '81, in order to provide pregnant women with prenatal care under Medicaid, also amended the Medicaid statute to authorize states to "deem" a pregnant woman an AFDC recipient for Medicaid purposes, and thus mandatorily eligible for Medicaid, if the woman would be eligible for AFDC based on the concept of the constructive birth of her fetus. OBRA '81 § 2312(b), 95 Stat. 357, 853. OBRA '81 also required states that provided coverage to medically needy individuals to provide prenatal care to medically needy pregnant women as well.

Thus, states had the option to supply Medicaid coverage for prenatal care to a pregnant woman either as mandatory categorically needy or as medically needy. *See* 42 U.S.C. § 1396d(a)(viii) (adding pregnant women as a separate eligibility group). At the same time, the Secretary continued to give the states the option of providing Medicaid coverage directly to the fetus by considering the fetus to be an individual under age of 21.

In the Deficit Reduction Act of 1984, Pub.L. No. 98–369, 98 Stat. 494 ("DRA '84"), Congress further expanded access to prenatal care by requiring the states to provide Medicaid benefits to "any qualified pregnant woman or child" as mandatory categorically needy. The statute defined a "qualified pregnant woman" as a pregnant woman who would be eligible for AFDC "if her child had been born and was living with her in the month such aid would be paid, and such pregnancy has been medically verified." DRA '84 § 2361(b), 98 Stat. 494, 1104 (codified as amended at 42 U.S.C. § 1396d(n)). The qualified pregnant woman provision expanded access to prenatal care because, while OBRA '81 merely gave the states the option to employ the constructive birth analysis to deem pregnant women AFDC recipients for the purposes of providing Medicaid coverage for prenatal care, DRA '84 required the states to do so. By mandating coverage for "qualified pregnant women," the statute also eliminated categorical barriers in the AFDC program that had arbitrarily limited access to Med-

4. The Second Circuit's decision in *Lewis IV–A* includes an extensive history of federal sponsorship of prenatal care. *See Lewis v. Grinker,* 965 F.2d 1206, 1209–12 (2d Cir.1992).

5. As set forth in greater detail in *Lewis IV–A,* federal sponsorship of prenatal care before the enactment of the Medicaid statute in 1965 fell largely under the AFDC program. Beginning in the 1940's, the federal government reimbursed those states that chose to provide AFDC benefits to fetuses as "dependent child[ren]" under 42 U.S.C. § 606(a). In *Burns v. Alcala,* 420 U.S. 575, 584, 95 S.Ct. 1180, 43 L.Ed.2d 469 (1975), the Supreme

Court held that fetuses were not dependent children within the meaning of the AFDC statute, and, thus, the states were not required to provide AFDC benefits to pregnant women. Between 1975 and 1981, however, the Secretary continued to give states the option of treating fetuses as dependent children in order to provide AFDC benefits to pregnant women. This informal practice, like the Secretary's informal practice of allowing states to provide Medicaid to fetuses as optional categorically needy individuals, was never adopted by formal regulation. *See Lewis IV–A,* 965 F.2d at 1209.

icaid for poor pregnant women such as those without any "dependent children."[6] DRA '84 also ensured that Medicaid coverage would follow the fetus after birth by providing that an infant born to a woman eligible for and receiving Medicaid benefits on the child's date of birth was automatically covered by Medicaid at birth. DRA '84 § 2362(a), 98 Stat. 494, 1104 (codified as amended at 42 U.S.C. § 1396a(e)(4)).

In the Consolidated Omnibus Budget Reconciliation Act, Pub.L. No. 99–272, 100 Stat. 82, 201 (1985) ("COBRA"), Congress again made it easier for pregnant women to qualify for prenatal care by breaking the link between AFDC eligibility and Medicaid eligibility. After COBRA, a prospective qualified pregnant woman only had to demonstrate that she was sufficiently poor to qualify for Medicaid benefits. Because the Secretary interpreted the constructive birth analysis to apply to all three sections of the definition of qualified pregnant woman, the fetus' interest could be considered in determining whether the woman was financially needy. In February 1985, in Program Memorandum # 85–3, for the first time the Secretary did not list fetuses as one of the categories of people under age 21 to whom the states could, at their option, provide Medicaid. This omission completed the shift from fetal-centered to maternal-centered analysis of coverage for prenatal care.

In the Omnibus Budget Reconciliation Act of 1986 ("OBRA '86"), Pub.L. No. 99–509, 100 Stat. 1874, Congress removed the categorical eligibility rules from the Medicaid prenatal scheme and began to expand prenatal coverage by raising financial eligibility ceilings for pregnant women. *See*

OBRA '86 § 9401(a) & (b), 100 Stat. 1874, 2050–51 (adding subclause (IX) to 42 U.S.C. § 1396a(a)(10)(A)(ii) and subsection (1) to 42 U.S.C. § 1396a). OBRA '86 also created a new period of "presumptive eligibility" for ambulatory prenatal care in order to speed access to services while Medicaid applications are being processed.

In 1988, Congress further expanded Medicaid coverage for prenatal care by making coverage for "women during pregnancy" mandatory, at least for those households with income under 133% of the federal poverty line. *See Medicare Catastrophic Coverage Act of 1988*, § 302(a), Pub.L. No. 100–360, 102 Stat. 683, 750–51 (adding subclause (IV) to 42 U.S.C. § 1396a(a)(10)(A)(I)). Congress also eliminated administrative obstacles to the provision of Medicaid coverage for "women during pregnancy." 42 U.S.C. §§ 1396a(a)(55), (c).

Congress has also required states to coordinate the operation of Medicaid and the Special Supplemental Food Program for Women, Infants, and Children ("WIC"), 42 U.S.C. § 1396a(a)(11)(C). The WIC program helps to provide for the nutritional needs of pregnant women and postpartum women and their newborn children. 42 U.S.C. § 1786.

### History of this Litigation

Plaintiffs Lydia Lewis *et al.* commenced this class action in 1979 to challenge a 1973 regulation of the Secretary, 42 C.F.R. § 435.402(b), and a companion New York State regulation, 18 NYCRR § 349.3, denying Medicaid benefits to all aliens except those lawfully admitted for permanent residence or permanently residing in the United States under color of law ("PRUCOL").[7] Plaintiffs challenged the regula-

---

**6.** Categorical requirements for AFDC included the presence in the household of a "dependent child" who was "deprived of parental support" in a prescribed manner. 42 U.S.C. § 606(a) (repealed).

**7.** This action was originally brought by plaintiffs Lydia Lewis and eight other named class representatives, all of whom were non-legal

permanent resident aliens residing in New York State. On January 16, 1989, then-Chief Judge Jack B. Weinstein certified a plaintiff class in this action, defined as "all aliens residing in the State of New York who have been denied Medicaid on the basis of their alienage." By order dated October 15, 1981, the class definition was modified to add the requirement that the aliens qualifying for

tions on four grounds: (1) the Medicaid statute did not explicitly authorize such regulations; (2) the regulations violated constitutional principles of equal protection and due process; (3) the Secretary's definition of PRUCOL under the regulations was impermissibly narrow; and (4) the regulations did not apply to benefits directed to the unborn children of pregnant alien women.

On July 14, 1986, this Court issued a memorandum and order which, among other things, determined that the Secretary's regulation, 42 C.F.R. § 435.402(b), was not authorized by the Medicaid statute, 42 U.S.C. §§ 1396 *et seq. See Lewis v. Gross,* 663 F.Supp. 1164 (E.D.N.Y.1986) (*Lewis I*). Having based this decision on statutory grounds, this Court did not reach any of plaintiffs' additional claims challenging the regulations. In particular, this Court did not address the application of alienage restrictions to the provision of prenatal care under Medicaid.

Following that decision but before a final judgment was entered, Congress passed OBRA '86.[8] Section 9406 of OBRA '86 provided the missing statutory authority for imposing restrictions on aliens' Medicaid eligibility by adding to § 1396a of the Medicaid statute the provision that,

> [n]otwithstanding paragraph 10(B) or any other provision of this subsection, a

membership in the class be living in New York "under color of law"; the plaintiff class was thus redefined to include "all aliens residing in New York State under color of law who have applied or attempted to apply for Medicaid benefits." By memorandum and order dated July 14, 1986, this Court denied the federal defendant's motion to decertify the class and granted the plaintiffs' motion to amend the complaint by modifying the class definition to delete the "under color of law" requirement. By the same decision, this Court also granted the motions of five individuals to intervene as additional named class representatives. Thus, the plaintiff class, as currently defined, includes "all aliens residing in New York State who have applied or attempted to apply for Medicaid but have been or would be denied on the basis of their

State plan shall provide medical assistance with respect to an alien who is not lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law only in accordance with section 1396b(v) of this title.

42 U.S.C. § 1396a (1991 Supp.). Section 1396b(v) provided:

> (2) Payments shall be made under this section for care and services that are furnished to an alien ... only if—
>
> > (A) such care and services are necessary for the treatment of an emergency medical condition of the alien, and
> >
> > (B) such alien otherwise meets the eligibility requirements for medical assistance under the State plan ...
>
> (3) For purposes of this subsection, the term 'emergency medical condition' means a medical condition (including emergency labor and delivery) manifesting itself by acute symptoms of sufficient severity.

42 U.S.C. § 1396b(v) (1991 Supp.). The legislative history of OBRA '86 explains that these amendments were designed specifically to address this Court's decision in *Lewis I. See* H.Rep. No. 99–727, at 111 (1985), *reprinted in* 1986 U.S.C.C.A.N. 3607, 3701 [hereinafter 1986 House Report].[9]

alienage." *Lewis v. Gross,* 663 F.Supp. 1164, 1170–71 (E.D.N.Y.1986).

**8.** The Omnibus Budget Reconciliation Act of 1986, Pub.L. No. 99–509, 100 Stat. 1874, 2050. New provisions concerning the Medicaid eligibility of aliens were also included in the Immigration Control and Reform Act of 1986 ("IRCA"), Pub.L. No. 99–603, 100 Stat. 3359.

**9.** The House Report accompanying OBRA '86 cited this Court's decision in *Lewis I* and stated: "In response to the [*Lewis*] Court's invitation to clarify Congressional intent, the Committee bill amends the Medicaid statute to make it explicit that Federal financial participation is not available for State expenditures for aliens who are not lawfully admitted

The federal defendant sought reconsideration of this Court's decision in *Lewis I* in light of this legislative change. While the federal defendant's motion for reconsideration of *Lewis I* was pending, the Secretary submitted to the Court an advance copy of an internal directive which, among other things, provided that pregnant non-PRUCOL aliens would no longer be eligible for Medicaid-sponsored prenatal care. On January 20, 1987, plaintiffs moved for a preliminary injunction to prevent this policy from going into effect on the ground that the unborn children of all alien women in this country, whether PRUCOL or not, were eligible under 42 U.S.C. § 1396d(a)(1) for Medicaid in their own names as optional categorically needy "individuals under the age of 21" under 42 U.S.C. § 1396d(a)(1).

On March 5, 1987, this Court issued a preliminary injunction enjoining defendants from denying Medicaid coverage for prenatal care to alien women residing in New York State with a medically verifiable pregnancy if their unborn children would be eligible for Medicaid had they been born at the time of the application. *See Lewis v. Grinker,* CV–79–1740, 1987 WL 8412 (E.D.N.Y. Mar.6, 1987) (*Lewis III*). This Court recognized that the federal and state defendants shared a "longstanding interpretation" of the Medicaid statute that unborn children were to be classified as "individuals … under the age of 21" under 42 U.S.C. § 1396d(a)(1) for Medicaid eligibility purposes. Relying on this longstanding administrative interpretation, this Court found that plaintiffs had shown a likelihood of success on the merits of their claims that the unborn children of alien mothers were eligible for Medicaid in their own names as optional categorically needy individuals under the age of 21 pursuant to § 1396d(a)(1). *See Lewis III,* 1987 WL 8412, at *9–10. The Secretary did not appeal this decision, "despite the fact that

for permanent residence or permanently residing in the U.S. under color of law." 1986

[this] court's determination that fetuses were eligible for Medicaid benefits in their own name conflicted with the agency's policy announced in the December 6, 1985 internal memorandum." *Lewis IV–A,* 965 F.2d at 1214.

In November 1989, plaintiffs moved for summary judgment seeking to convert the preliminary injunction of *Lewis III* into a permanent injunction. On March 14, 1991, this Court entered a permanent injunction enjoining defendants from denying Medicaid to pregnant non-PRUCOL aliens. *See Lewis v. Grinker,* 794 F.Supp. 1193 (E.D.N.Y.1991) (*"Lewis IV"*), *aff'd, and reh'g denied,* 965 F.2d 1206 (2d Cir.1992).

In *Lewis IV,* this Court reconsidered its earlier decision in *Lewis III* and found that fetuses were not eligible for Medicaid in their own name as "individuals … under the age of 21" under § 1396d(a)(1). *See Lewis IV,* 794 F.Supp. at 1198.

This Court determined, however, that pregnant non-PRUCOL aliens were themselves eligible for Medicaid-sponsored prenatal care as "qualified pregnant women" under § 1396a(a)(10)(A)(i)(III). Because the plain language of the Medicaid statute based a pregnant woman's eligibility for Medicaid on her eligibility for AFDC benefits under the AFDC statute, *see* 42 U.S.C. § 1396d(n), which in turn considered a pregnant woman eligible for AFDC benefits in the last three months of her pregnancy if she would be eligible based on the constructive birth of the fetus, *see* 42 U.S.C. § 606, this Court concluded that the "qualified pregnant woman" provision of the statute required that the fetus be deemed born and that the fetus if born would be a United States citizen. *See Lewis IV,* 794 F.Supp. at 1199.

This Court found that such an interpretation of the Medicaid statute was supported by congressional purposes behind Medicaid-sponsored prenatal care. Al-

House Report, 1986 U.S.C.C.A.N. at 3701.

though prenatal care is provided through the mother, "Congress' intent with respect with Medicaid for prenatal care was to assure that the fetus is born as a healthy child who does not, as a citizen, become a burden on the country's social welfare system." *Id.* at 1200. Because the intended recipients of Medicaid coverage for prenatal care are not the non-PRUCOL mothers but their future children, "it is common sense to look to post-birth not pre-birth qualifications." *Id.* at 1200–01. Noting that "the denial of prenatal care in the circumstances here presented may well violate the equal protection clause," *id.* at 1203, this Court found that such an interpretation of the statute was further supported by the *Ashwander* doctrine of avoiding constitutional conflicts. *See id.* at 1202–04. Because § 1396b(v) could be appropriately read as providing Medicaid coverage for prenatal care for the citizen children of non-PRUCOL aliens, this Court granted the permanent injunction.

The federal defendant appealed and on January 31, 1992, the Second Circuit affirmed this Court's permanent injunction somewhat on different grounds than those relied on by this Court. *Lewis v. Grinker,* 965 F.2d 1206 (2d Cir.)("*Lewis IV–A*"). The Second Circuit held, as did this Court, that, despite the general alien eligibility restrictions in OBRA '86, Congress did not intend to bar otherwise eligible non-PRUCOL pregnant aliens from receiving Medicaid-sponsored prenatal care. The Second Circuit concluded, however, that the plain language of OBRA '86 appeared to require the Secretary to deny Medicaid benefits for prenatal care to non-PRUCOL pregnant aliens. However, after reviewing the legislative history and statutory background of OBRA '86, the Second Circuit concluded that Congress did not realize that this result would follow from the blanket alienage restriction included in OBRA '86, and that, had Congress foreseen such a result, it would not have enacted the statute as written.

The Second Circuit found several reasons to believe that Congress did not foresee the results of the language it employed in OBRA '86. First, noting that "the Medicaid Act is a statute of 'unparalleled complexity' . . . [and] among the 'most intricate ever drafted by Congress,'" the Second Circuit stated, "we are always mindful of the possibility that Congress may have failed to perceive a particular consequence of a blanket change in this complex statutory scheme." *Id.* at 1216 (internal citations omitted). It further noted that it was "particularly unwise to blindly assume that Congress will always fully anticipate every implication of the plain meaning of a particular amendment" when the amendment "comes in the form of an end-of-session, omnibus budget reconciliation bill." *Id.* Further, the Second Circuit found that few areas within the "contorted scheme" of Medicare "are more complex than the coverage of prenatal care" and noted that "Congress had frequently tripped over the statute's complexities" in its efforts to "radically expand[ ]" access to prenatal care and to shift "from a fetal centered to a maternal centered" approach to the provision of prenatal care. *Id.* at 1216. The Second Circuit then found that Congress had failed to recognize in the legislative history to OBRA '86 that, as a result of the 1985 amendments to the Medicaid statute, pregnant women became eligible for Medicaid as mandatory categorically needy individuals. The Second Circuit found that in light of the Secretary's longstanding use of the fiction of the constructively born child, Congress might have erroneously assumed that, even after OBRA '86, the states would be free to extend prenatal care directly to the fetus as an "individual under the age of 21." *Id.* at 1217. Finally, it found that construing OBRA '86 otherwise would raise serious equal protection questions. Because the statute provided that newborn children are automatically eligible for Medicaid in their own names at birth if their mothers were eligible for Medicaid-sponsored prenatal care,

*see* 42 C.F.R. § 435.117 (1991), the Second Circuit noted that an interpretation of the statute which found non-PRUCOL pregnant aliens ineligible for Medicaid would result in discrimination against the citizen child of such an alien on the basis of the alien status of the parent. *See id.* at 1217.

After concluding that Congress "did not foresee that the blanket alienage restriction [in OBRA '86] would have the effect of denying prenatal care to future citizens," the Second Circuit next considered "whether this unexpected result is contrary to the clearly expressed intent of Congress." *Id.* at 1219. It noted that "[i]n the ordinary case, we would be reluctant to conclude that even an unexpected result conflicted with Congressional purpose." *Id.* However, after considering Congress' purpose in enacting OBRA '86 and "the long history of Congressional treatment of prenatal care," the Second Circuit concluded that the result of the plain language of the statute conflicted with Congress' clearly expressed intent. Noting the indisputable conclusion that prenatal care is cost-effective, the court first found that denying prenatal care to non-PRUCOL pregnant aliens would undermine the "clearly expressed Congressional purpose [behind OBRA '86] of curbing expenditures." *Id.* The court next found that its conclusion that denying prenatal care to non-PRUCOL pregnant aliens "conflicts with Congressional purpose is further solidified by the fact that Congress has over the years unequivocally expressed its desire to continue to expand access to prenatal care." *Id.* at 1219. The court thus concluded that this case

> present[ed] the extremely rare instance where we can discern a clearly expressed Congressional intent contrary to the plain language of the statute. Had Congress realized the implications of the alien restriction, it would most certainly not have cut off prenatal care to non-PRUCOL women. In short, this is the rare case like *Rose* where refusing to extend a broad statutory prohibition to a

situation Congress did not foresee is necessary to avoid impeding a clearly expressed Congressional purpose.

*Id.* at 1219.

While the court of appeals expressed no opinion on the constitutionality of denying prenatal care to non-PRUCOL pregnant aliens, it went on to note that " 'legislation directing the onus of a parent's misconduct against his children does not comport with fundamental conceptions of justice.' " *Id.* at 1219–20 (quoting *Plyler v. Doe*, 457 U.S. 202, 220, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982)). Accordingly, it declared that "we are unwilling to over-ride Congress's clearly expressed intention to curb expenditures by expanding prenatal care without more persuasive indicia of Congressional intent than are present here." *Id.* at 1220. The Secretary moved for a rehearing, which was denied. The Secretary did not seek a writ of certiorari from the United States Supreme Court.

### The Welfare Reform Act

Following the court of appeals' decision, Congress, in 1996, enacted the Welfare Reform Act. Title IV of that Act, codified as amended at 8 U.S.C. §§ 1601 *et seq.*, obtained approximately $24 billion in cuts in federal spending by enacting sweeping new restrictions on aliens' eligibility for federal welfare benefits. Section 401(a) of the Welfare Reform Act repealed the alienage restriction on the receipt of Medicaid benefits set forth in OBRA '86 and replaced it with a more stringent alienage restriction. *See* Welfare Reform Act § 401(a), 110 Stat. 2105, 2261. Section 401(a), codified at 8 U.S.C. § 1611(a), provides that, in order to be eligible for any "Federal public benefit," including Medicaid, an alien must be a "qualified alien." 8 U.S.C. § 1611(a) (West Supp.1999). Section 431(b) of the Welfare Reform Act defines a "qualified alien" to mean:

> an alien who, at the time the alien applies for, receives, or attempts to receive a Federal public benefit, is—

(1) an alien who is lawfully admitted for permanent residence under the Immigration and Nationality Act,

(2) an alien who is granted asylum under section 208 of such Act,

(3) a refugee who is admitted to the United States under section 207 of such Act,

(4) an alien who is paroled into the United States under section 212(d)(5) of such Act for a period of at least 1 year,

(5) an alien whose deportation is being withheld under section 243(h) of such Act, or

(6) an alien who is granted conditional entry pursuant to section 203(a)(7) of such Act as in effect prior to April 1, 1980.

Welfare Reform Act § 431(b), 110 Stat. 2105, 2274 (codified as amended at 8 U.S.C. § 1641).[10] Section 401 of the Welfare Reform Act thus not only extended alien eligibility restrictions to a much wider array of federal welfare programs (any "federal public benefit"), but it also narrowed the classes of aliens eligible for programs such as Medicaid to which the PRUCOL standard had previously applied.[11]

Section 401(b) of the Welfare Reform Act, however, continued to provide for certain limited exceptions to the general rule that only "qualified aliens" are eligible for federal public benefits. Section 401(b)(1)(A), in particular, codified as amended at 8 U.S.C. § 1611(b)(1)(A), provides that Section 401(a) does not apply to:

[m]edical assistance under title XIX of the Social Security Act [42 U.S.C. §§ 1396 *et seq.*] (or any successor program to such title) for care and services that are necessary for the treatment of an emergency medical condition (as defined in section 1903(v)(3) of such Act [42 U.S.C. § 1396b(v)(3) ] ) of the alien involved and are not related to an organ transplant procedure, if the alien involved otherwise meets the eligibility requirements for medical assistance under the State plan approved under such title....

8 U.S.C. § 1611(b)(1)(A) (West Supp.1999). The Medicaid statute, 42 U.S.C. § 1396b(v)(3), defines an "emergency medical condition" as:

a medical condition (including emergency labor and delivery) manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—

(A) placing the patient's health in serious jeopardy,

(B) serious impairment to bodily functions, or

(C) serious dysfunction of any bodily organ or part.

42 U.S.C. § 1396b(v)(3) (West Supp.1999).

Section 401(b)(1)(A) is the only exception that explicitly authorizes the provision of Medicaid benefits to unqualified aliens. However, Section 401(b)(1)(C) also pro-

---

**10.** Section 501 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104–208, 110 Stat. 3009, amended the definition of "qualified alien" to include certain battered alien spouses and children, regardless of their immigration status. *See* 8 U.S.C. § 1641(c)(7) (West Supp.1999).

**11.** Newly excluded classes of aliens include, for example, immigrants who are in fact residing in the United States with the knowledge and permission of the Immigration and Naturalization Service ("INS") whose departure the INS does not contemplate enforcing and who do not fall within the definition of

"qualified alien"; spouses and other immediate relatives of United States citizens for whom the citizen has filed an immediate relative petition and who have a pending application for adjustment of status; immigrants granted suspension of deportation due to extreme hardship other than domestic violence who are awaiting admission as a lawful permanent resident; immigrants who have entered and continuously resided in the United States since before January 1, 1972; and immigrants granted voluntary departure for humanitarian reasons whose departure the INS does not contemplate enforcing.

vides a limited exception from the general provisions of the statute for public health assistance other than Medicaid assistance for "immunizations with respect to immunizable diseases and for testing and treatment of communicable diseases whether or not such symptoms are caused by a communicable disease." Welfare Reform Act § 401(b)(1)(C), 110 Stat. 2105, 2261 (codified at 8 U.S.C. § 1611(b)(1)(C)).[12] In addition, the Welfare Reform Act exempts the federally funded School Lunch and Breakfast programs from Section 401(a)'s alienage restriction and offers the states the option of not applying the restriction to various federally funded nutrition programs, including the WIC program. *See* 8 U.S.C. § 1615 (West Supp.1999).

### FACTS

The basic facts relevant to this application are not disputed. Indeed, many of the relevant findings made in 1991 in *Lewis IV* and reiterated by the Second Circuit in 1992 in *Lewis IV-A* continue to be the case today, and the federal defendant does not dispute the continued validity of these findings.

While the federal defendant notes the obvious possibility that the fetus of an unqualified pregnant alien may never become a citizen of this country because it may not be born at all or because it may depart from the United States *en ventre sa mere*, it is not disputed that a substantial number of unqualified pregnant aliens will give birth to their children in the United States. Under federal law and the Constitution, these children will be citizens of this country at the moment of their birth. *See, e.g., INS v. Rios–Pineda*, 471 U.S. 444, 105 S.Ct. 2098, 85 L.Ed.2d 452 (1985).

It is also undisputed that prenatal care is critical to the health of a substantial number of these citizen children. Children who do not receive prenatal care unquestionably are far more likely to be born with severe and debilitating birth defects and other physical and mental deformities. The substantial social costs of failing to provide prenatal care also remain undisputed. As this Court found in *Lewis IV*, "[a]s a result of handicaps related to birth defects, many of these children, now born citizens, will be unable to lead productive lives in this country because of their conditions and will be supported by a variety of other social welfare programs." *Lewis IV*, 794 F.Supp. at 1196.

It is also undisputed that, from a cost-effectiveness perspective, prenatal care is far superior to the subsequent treatment of preventable birth defects. Indeed, Congress has itself elsewhere recognized this cost-effectiveness by consistently expanding Medicaid eligibility for pregnant women and access to prenatal care.[13]

As further evidence of the substantial costs of denying prenatal care to unqualified pregnant aliens, plaintiffs cite studies published since 1992 that confirm the earli-

---

**12.** Other exceptions in Section 401(b)(1) include federal public benefits for short-term, non-cash, in-kind emergency disaster relief, § 401(b)(1)(B), 8 U.S.C. § 1611(b)(1)(B); certain community service programs specified by the Attorney General, § 401(b)(1)(D), 8 U.S.C. § 1611(b)(1)(D); and certain programs for housing or community development or financial assistance administered by the Secretary of Housing and Urban Development or provided under section 306C of the Consolidated Farm and Rural Development Act, § 401(b)(1)(E), 8 U.S.C. § 1611(b)(1)(E).

**13.** The Second Circuit reiterated these findings in *Lewis IV-A*, noting that "the Secretary does not dispute that prenatal care is cost

effective or that a significant number of children will suffer birth defects as a direct result of the denial of prenatal care to their non-PRUCOL mothers." *Lewis IV-A*, 965 F.2d at 1214. It found that "[s]tudies have shown that every dollar spent on prenatal care saves between two and ten dollars in future medical costs." *Id.* at 1219. Recognizing that the unborn children of the members of the plaintiff class will become United States citizens at the moment of their birth, the Second Circuit found that, "[a]s Congress was aware, at that point the medical neglect that these children suffered during their mothers' pregnancies will come home to roost in the health care system, at exponentially higher costs." *Id.*

er findings of this Court and the Second Circuit and submit the affidavit of Dr. Howard L. Minkoff, Distinguished Professor of Obstetrics and Gynecology and Director of Maternal–Fetal Medicine at the State University of New York Health Science Center in Brooklyn, New York. Dr. Minkoff concludes that "any action which would limit access to prenatal care—especially amongst at risk women—would seriously undermine the slow, but steady gains made in the fight against infant mortality and low birth weight," and, accordingly, were this Court to vacate the permanent injunction, "more than a decade's investment in expanding access to prenatal care [among high risk alien women] would be lost." (Dr. Minkoff Aff. ¶¶ 17, 43.)

Based on recent studies, Dr. Minkoff reports that the rates of infant mortality and low birth weight have improved slowly since the early 1980's due to increased attention from the medical and political community. While infant mortality rates in urban areas such as New York City remain higher than the national average, they have slowly decreased due to increased access to prenatal care.[14] The infant mortality rate for New York City's non-white population, however, has not decreased as dramatically.[15] Dr. Minkoff reports that recent studies have confirmed the crucial role of prenatal care in reducing low birth weight and infant mortality rates. A recent March of Dimes study found that infants born to mothers who received late or no prenatal care were about twice as likely to be low birth weight (12% vs. 6.7%) and very low birth weight (2.5% vs. 1.2%) as infants born to mothers who received early prenatal care. (Minkoff Aff. ¶ 31). New York State's Public Health Council recently concluded that "New York's goal should be to have com-

prehensive prenatal care received by every pregnant woman in New York State." (Minkoff Aff. ¶ 32.)

Other recent studies have shown that prenatal care continues to be cost-effective. A study delivered at the American Public Health Association determined that the average cost of providing prenatal care and initial hospitalization for delivery is now approximately $1,200 per child, while the initial hospitalization cost is $10,000 for a low-birth-weight baby and $65,000 for a very low-birth-weight baby. (Minkoff Aff. ¶ 38.) The New York State Department of Health has estimated that the annual costs of providing prenatal care for approximately 13,472 births to undocumented pregnant women in New York State is approximately $15,555,600. The total initial hospitalization (delivery and post-natal care) costs for normal weight, low-birth-weight, and very low-birth-weight babies of these women are $44,487,259. In the absence of prenatal care for these same babies, the total initial hospitalization costs for all birth weights would be $59,183,574. As a result, the New York State Department of Health concludes that the expenditure of $15.5 million on prenatal care for undocumented women saves an estimated $14.7 million just in the costs of providing initial hospitalization for these babies, and not including the extraordinary additional costs of providing lifelong medical care or the lifelong expense of special education for babies born with severe birth defects. (Minkoff Aff. ¶¶ 39 & 40.) A study by the Southern Governors' Regional Task Force on Infant Mortality similarly found that between $2 and $10 can be saved in medical care costs for every dollar spent in providing early prenatal care. (Minkoff Aff. ¶ 42.)

14. In New York City, infant mortality has decreased from 16.1 per thousand in 1980 to 10.2 per thousand in 1993. During the same period, the number of women in New York City who received only late prenatal care or none at all dropped from 18.5% in 1980 to 10.7% in 1993. (Minkoff Aff. ¶¶ 15, 34.)

15. In New York City in 1985, the infant mortality rate per thousand for non-white babies was 15.6; in 1993, despite the dramatic decrease in infant mortality among whites, the infant mortality rate for the non-white population was 13.2 per thousand live births. (Minkoff Aff. ¶ 16.)

## DISCUSSION

■ The federal defendant moves for an order dissolving the permanent injunction issued in *Lewis IV* and dismissing the complaint. Although Federal Rule of Civil Procedure 65 does not address the subject of modifying or vacating injunctions, it is well established that a court may order the modification or vacation of an injunction due to changes in the relevant decisional or statutory law. *See, e.g., System Fed'n No. 91 v. Wright,* 364 U.S. 642, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961); 11A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2961 (1995). The Supreme Court has stated that "[t]he parties have no power to require of the court continuing enforcement of rights the statute no longer gives." *System Fed'n No. 91,* 364 U.S. at 652, 81 S.Ct. 368.

The federal defendant contends that the injunction must be vacated because it is inconsistent with both the plain language and the clear legislative history of the alien eligibility restriction contained in Section 401(a) of the Welfare Reform Act. In *Lewis IV-A,* the Second Circuit held that the statutory language in OBRA '86 then at issue should not be read to deny Medicaid benefits for non-emergency prenatal care to non-PRUCOL pregnant aliens "without more persuasive indicia of Congressional intent." *Lewis IV-A,* 965 F.2d at 1220. The federal defendant suggests that Congress has now provided that missing evidence of its specific intent, both in the language of Section 401 of the Welfare Reform Act and in the statute's legislative history.

In response, plaintiffs contend that neither the language nor the legislative history of the Welfare Reform Act establishes that Congress intended to overrule the Second Circuit's holding in *Lewis IV-A* or to deprive all unqualified pregnant aliens of Medicaid benefits for routine prenatal care. Alternatively, plaintiffs argue that, if the federal defendant's interpretation of the Welfare Reform Act were accepted as correct, the Secretary's application of Section 401(a) of the Act to deny Medicaid for routine prenatal care to unqualified pregnant aliens would violate the Due Process Clause of the Fifth Amendment.

Before confronting the constitutional questions presented by this argument, this Court must "first ascertain whether a construction of the statute is fairly possible by which [those] question[s] may be avoided." *Ashwander v. Tennessee Valley Auth.,* 297 U.S. 288, 347–48, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

### Interpretation of Section 401(a) of the Act

Relying on the same rules of statutory construction employed by the Second Circuit in *Lewis IV-A,* the federal defendant first argues that the language of Section 401(a) of the Welfare Reform Act must be construed to preclude unqualified pregnant aliens from receiving Medicaid for non-emergency, or routine, prenatal care.

In *Lewis IV-A,* the court of appeals noted that "in the usual case," a reviewing court's analysis must end where the plain language of the statute is clear and unambiguous. *See Lewis IV-A,* 965 F.2d at 1215, 1221. The Second Circuit recognized, however, that, where "'rare and exceptional' circumstances exist, the plain language of a statute may not be controlling." *Id.* at 1221–22 (quoting *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981)). Relying on the Supreme Court's decision in *Rose v. Rose,* 481 U.S. 619, 107 S.Ct. 2029, 95 L.Ed.2d 599 (1987), the court of appeals found that such "rare and exceptional" circumstances exist "where refusing to extend a broad statutory prohibition to a situation Congress did not foresee is necessary in order to avoid impeding a clearly expressed Congressional purpose." *Id.* at 1219. The Second Circuit thus found that, "where a broad statutory purpose leads to unforeseen results contrary to the purpose of the prohibition, a court may legitimately recognize an exception to a broad statuto-

ry prohibition in order to further Congress's purpose." *Id.* at 1215.

After considering the legislative history of OBRA '86 and the "long history of Congressional treatment of prenatal care" generally, *id.* at 1219, the Second Circuit ultimately concluded that Congress did not realize that the plain language of the blanket alienage restriction in OBRA '86 would result in the denial of Medicaid benefits for routine prenatal care to non-PRUCOL women and that, had Congress foreseen this result, it would not have enacted the statute as written. The Second Circuit therefore found that recognizing an exception to the alienage restriction in OBRA '86 for the provision of Medicaid-sponsored prenatal care to non-PRUCOL pregnant aliens was necessary to further Congress' purpose.

Here, plaintiffs do not dispute that the plain language of Section 401 of the Welfare Reform Act, like the plain language of OBRA '86, precludes unqualified pregnant aliens from receiving Medicaid benefits for routine prenatal care. Section 401(a), as codified at 8 U.S.C. § 1611(a), provides that "[n]otwithstanding any other provision of law and except as provided in subsection (b), an alien who is not a qualified alien" is precluded from receiving any non-emergency Medicaid benefits. 8 U.S.C. § 1611. Pregnant aliens are not "qualified aliens" within the meaning of the Welfare Reform Act. 8 U.S.C. § 1641. Nor has the phrase "emergency medical condition" ever been defined, nor have plaintiffs argued that it should be interpreted, to include routine prenatal care. *See* 42 U.S.C. § 1396b(v)(3); (Pls.' Opp. at 15).[16]

Accordingly, following the same rules of statutory construction employed by the Second Circuit in *Lewis IV–A*, the only question that remains is whether Congress, when it passed the Welfare Reform Act, failed to realize that the blanket alien eligibility restriction included in Section 401(a) of the Act would have the effect of precluding unqualified pregnant aliens from receiving Medicaid benefits for routine prenatal care. The federal defendant argues that it is unlikely that such a "rare and extraordinary" circumstance—i.e., that Congress was confused by the words it drafted—occurred not once, but twice within a ten-year period with respect to two different statutes concerning the same subject. In all events, the federal defendant argues that the legislative history of the Welfare Reform Act, unlike that of OBRA '86, reflects an intent on the part of Congress to bring about the limitations on prenatal care that plaintiffs seek to avoid. Because Congress fully realized the effects of Welfare Reform Act's plain language, the federal defendant argues that this case does not present a "rare and extraordinary" situation in which this Court may legitimately recognize an exception to the statutory prohibition.

In support of its argument, the federal defendant cites two fragments from the Welfare Reform Act's legislative history. The first, and most explicit, is a statement included in the Conference Committee Report for the Act:

*House bill*

Noncitizens who are "not qualified aliens" (generally, illegal immigrants and nonimmigrants such as students) are ineligible for all Federal public bene-

16. The federal defendant also notes that the category of "qualified aliens" eligible for Medicaid under the Welfare Reform Act is much narrower and far more restrictive than the category of PRUCOL aliens eligible for Medicaid under OBRA '86. Accordingly, the federal defendant argues that, because the plain language of the Welfare Reform Act is the same in structure but far more sweeping in its prohibition than the plain language of OBRA '86, which the Second Circuit has al-

ready analyzed in *Lewis IV–A*, it follows that the equivalently structured but far more restrictive plain language of the Welfare Reform Act *also* prohibits undocumented pregnant aliens from receiving Medicaid for routine prenatal care. Because plaintiffs and this Court acknowledge that the plain language of the Section 401 precludes Medicaid coverage for routine prenatal care, however, it is unnecessary to address the federal defendant's argument.

fits, with limited exceptions for emergency medical services. . . .

*Conference Agreement*

. . . .

The allowance for emergency medical services under Medicaid is very narrow. The conferees intend that it only apply to medical care that is strictly of an emergency nature, such as medical treatment administered in an emergency room, critical care unit, or intensive care unit. *The conferees do not intend that emergency medical services include prenatal or delivery care assistance that is not strictly of an emergency nature as specified herein.*

H.Conf.Rep. No. 104–725, at 874–75 (1996), *reprinted in* 1996 U.S.C.C.A.N. 2649, 2767–68 (emphasis added).

The version of the bill reported out by the Conference Committee was adopted by the House and Senate in its entirety on July 31, and August 1, 1996, respectively. H.R.3734 (Enrolled Bill (sent to President)); Welfare Reform Act § 401(b)(1), 110 Stat. at 2261. On August 22, 1996, the President signed the conference version of the bill into law as the Welfare Reform Act.

In addition to this statement in the Conference Committee Report, the federal de-

fendant also points to 104th Congress' consideration and ultimate rejection of proposed statutory language that would have guaranteed Medicaid coverage for routine prenatal care for certain unqualified aliens. During the same session that considered and adopted the Welfare Reform Act, the 104th Congress considered and enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. No. 104–208, 100 Stat. 3009, 3009–546 ("IIRIRA"). On April 10, 1996, prior to Congress' adoption of the Welfare Reform Act,[17] the Senate Committee on the Judiciary issued its report on Senate Bill S.1664, the Senate version of the bill that ultimately was enacted as the IIRIRA. S.1664, like H.R.3734 the bill which later became the Welfare Reform Act, contained its own version of an alienage restriction on the receipt of federal welfare benefits.[18] S.1664, however, unlike H.R.3734 as considered by either house or as adopted by both houses, contained an express exception authorizing certain otherwise ineligible aliens to receive Medicaid for non-emergency prenatal and postpartum services. Thus, Section 201(a)(4) of S.1664 provided that an ineligible alien could receive pregnancy services, including prenatal care, if she had resided in the United States continuously for three years or more.[19]

---

**17.** The bill that ultimately became the Welfare Reform Act, H.R.3734, was reported by the House in June 1996 and by the Conference Committee in July 1996. *See* H.R.Conf.Rep. No. 104–725, at 1 (1996), *reprinted in* 1996 U.S.C.C.A.N. 2649, 2649; H.R.Rep. No. 104–651, at 1 (1996), *reprinted in* 1996 U.S.C.C.A.N. 2183, 2183.

**18.** Pursuant to Section 201(a)(1) of S.1664, certain excludable, deportable, and nonimmigrant aliens would have been ineligible for federal public assistance and benefits:

(1) IN GENERAL.—Notwithstanding any other provision of law, an ineligible alien (as defined in subsection (f)(2)) shall not be eligible to receive—
(A) any benefits under a public assistance program (as defined in subsection (f)(3)), except—
(i) emergency medical services under title XIX of the Social Security Act,

(ii) subject to paragraph (4), prenatal and postpartum services under title XIX of the Social Security Act,
(iii) short-term emergency disaster relief,
(iv) assistance or benefits under the National School Lunch Act,
(v) assistance or benefits under the Child Nutrition Act of 1966,
(vi) public health assistance for immunizations and, if the Secretary of Health and Human Services determines that it is necessary to prevent the spread of a serious communicable disease, for testing and treatment for such diseases, and
(vii) such other service or assistance (such as soup kitchens, crisis counseling, intervention (including intervention for domestic violence), and short-term shelter) as the Attorney General specifies. . . .

**19.** Section 201(a)(4) of S.1664 further provided that no more than $120,000,000 could be

Congress effectively rejected this version of S.1664 when it enacted the Welfare Reform Act and the IIRIRA. Although S.1664 had been reported out of committee in April 1996, the Senate did not include language identical or similar to the prenatal care exception in Section 201(a)(4) of S.1664 in the final version of the Welfare Reform Act passed by the Senate on July 23, 1996. Moreover, Congress did not include language similar to the exception in Section 201(a)(4) of S.1664 when both houses agreed to the version of the Welfare Reform Act reported out of the Conference Committee on July 31 and August 1, 1996, respectively.

Congress also failed to include language similar to the prenatal care exception in Section 201(a)(4) of S.1664 when it amended the provisions of the Welfare Reform Act by enacting the IIRIRA.[20] In Section 501 of IIRIRA, Congress amended Section 431 of the Welfare Reform Act to allow Medicaid coverage for certain unqualified aliens who have been "battered" or subjected to extreme cruelty by a family member. See IIRIRA § 501, 110 Stat. at 3009–670, 3009–671 (codified as amended at 8 U.S.C. § 1641(c)). Although the offering of this amendment might have provided another occasion for creating an exception for prenatal care benefits for unqualified aliens, Congress again failed to include in Section 501 of IIRIRA language identical or similar to the prenatal care exception contained in Section 201(a)(4) of S.1664.

Both sides trade oft-cited quotations concerning the significance of Congress' failure to include language similar to the prenatal care exception in Section 201(a)(4) of S.1664 in either the Welfare Reform Act or the IIRIRA and whether that failure constitutes additional evidence that Congress did not intend for unqualified pregnant aliens to receive Medicaid benefits for non-emergency prenatal care. The federal defendant cites Justice Stewart's observation that " '[f]ew principles of statutory construction are more compelling than the proposition that Congress does not intend sub silentio to enact statutory language that it has earlier discarded in favor of other language.' " INS v. Cardoza–Fonseca, 480 U.S. 421, 442–43, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (quoting Nachman Corp. v. Pension Benefit Guaranty Corp., 446 U.S. 359, 393–93, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980) (Stewart, J., dissenting)). Plaintiffs parry[21] with the oft-cited observation that "[a]s a general matter, we are 'reluctant to draw inferences from Congress's failure to act.' " Brecht v. Abrahamson, 507 U.S. 619, 632, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 306, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988)).

As a practical matter, the inclusion of an exception for Medicaid coverage for routine prenatal care in S.1664 suggests that at least some members of the Senate realized that the broad alienage restriction in Section 201 of that Senate bill precursor of IIRIRA would result in the denial of Medicaid benefits for routine prenatal care to many pregnant aliens. That is not to say that Congress' failure in IIRIRA to adopt the prenatal care exception in Section 201(a)(4) of S.1664 or language similar to

---

expended under Title XIX of the Social Security Act for reimbursement of prenatal and postpartum services to such ineligible aliens. Further, that subsection would have required states that had provided such services for a period of three years before the date of enactment, such as New York pursuant to this Court's permanent injunction in Lewis, to continue to provide such prenatal care and would have permitted other states to elect to provide such care.

20. While S.1664 included its own version of a broad restriction on aliens' eligibility for federal welfare benefits, IIRIRA, as it was enacted, did not include such a restriction. In fact, the Welfare Reform Act was the only statute adopted by the 104th Congress to include such an alienage restriction.

21. See Karl N. Llewellyn, Remarks on the Theory of Appellate Decision and the Rules or Canons About How Statutes Are to Be Construed, 3 Vand.L.Rev. 395 (1950).

that exception constituted a recognition on the part of the 104th Congress as a whole that the broad alienage restriction in Section 401(a) of the *Welfare Reform Act* would produce such a result. S.1664 was an earlier Senate version of the bill that ultimately became the IIRIRA, rather than an earlier Senate version of the bill that ultimately became the Welfare Reform Act. Thus, this case does not present a situation where Congress considered and rejected an earlier Senate or House version of the very same statutory provision that ultimately was enacted by Congress. *Cf. Cardoza–Fonseca*, 480 U.S. at 441–43, 107 S.Ct. 1207 (inferring congressional intent regarding standard for relief under Section 208(a) of the Refugee Act of 1980, 94 Stat. 1102, from Congress' rejection of a stricter standard in Senate version of the Act, S.643, in favor of a more relaxed standard of House version of the statute, H.R.2816); *United States v. Ten Cartons*, 72 F.3d 285, 287 (2d Cir.1995) (giving persuasive weight to Congress' rejection of an earlier version of the Dietary Supplement and Health Education Act ("DSHEA") when construing portion of the Federal Food, Drug, and Cosmetic Act amended by the DSHEA). Nor does there exist any legislative history of S.1664 that provides evidence of the Senate's motives in rejecting that bill or declining to adopt the prenatal care exception in Section 201(a)(4) of the bill. *Cf. J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 562–63, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981) (finding that House and Senate reports indicated "strong opposition in both houses" to proposed provision); *Cardoza–Fonseca*, 480 U.S. at 442 n. 27, 107 S.Ct. 1207 (testimony before congressional committees indicated that Congress realized the differences between the two standards at issue).[22] Ac-

cordingly, I will not draw any inferences from the 104th Congress' failure to include Section 201(a)(4) of S.1664 or language similar to its prenatal care exception in the Welfare Reform Act under consideration.

The statement in the Conference Committee Report for H.R.3734 provides, however, strong evidence that the 104th Congress realized and intended the effects of the plain language of Section 401(a) of the Welfare Reform Act with respect to the provision of Medicaid for routine prenatal care to unqualified pregnant aliens. The statement is included in a section of the Conference Committee Report that discusses Congress' understanding of the overall effect of Section 401, including both the broad restriction on aliens' eligibility for federal public welfare benefits set forth in Section 401(a) and the exceptions to that broad restriction set forth in Section 401(b). The statement in the Conference Committee Report thus makes sense only if the 104th Congress believed that Medicaid coverage for routine prenatal care would be subject to the newly enacted general alienage exclusion in Section 401(a) in the first place.

Thus, if this Court is to adhere to the rules of statutory construction employed by the Second Circuit in *Lewis IV–A*, as it must, this Court's inquiry must end. The Conference Committee Report provides the evidence for which the court of appeals was searching in *Lewis* —that Congress realized and intended the effects of the plain language of Section 401(a)'s alien eligibility restriction on the provision of Medicaid benefits for routine prenatal care to unqualified pregnant aliens.

While plaintiffs offer a host of arguments [23] in response to the federal defen-

---

**22.** Plaintiffs also contend that the cases cited by the federal defendant are distinguishable because the courts in those cases were responding to proposals to create new legislation or to change existing law. Plaintiffs argue that, because the background law in this case included the Second Circuit's decision in *Lewis IV–A*, no specific change was necessary

to preserve Medicaid coverage for non-emergency prenatal care for unqualified aliens. The Second Circuit's decision in *Lewis IV–A*, however, is controlling only in this Circuit.

**23.** Plaintiffs argue, *inter alia*, that the Conference Committee's statement is not entitled to authoritative weight because it purports to

dant's interpretation of Section 401(a), none of these arguments provide a meaningful response to the federal defendant's contention that this statement in the Conference Committee Report supplies the clear evidence of congressional intent that the Second Circuit found missing in *Lewis IV–A*.

Plaintiffs first argue that the Conference Committee's statement regarding the scope of the emergency medical services exception in Section 401(b)(1)(A) is irrelevant to the issue before the Court because in plaintiffs' view the Second Circuit in *Lewis IV–A* found it appropriate to recognize an exception to the broad alienage restriction in OBRA '86 for such prenatal care in order to "avoid impeding" Congress' clearly expressed intent to expand access to prenatal care and to curb expenditures. *See Lewis IV–A*, 965 F.2d at 1219. In this connection, plaintiffs note that Congress' commitment to expanded access to prenatal care, its concern for the health of children residing in this country, and its desire to curb expenditures remain as strong today as they did at the time of the Second Circuit's decision in *Lewis IV–A*. In further support of their argument, plaintiffs cite the Welfare Reform Act's failure to amend or restrict the provisions of the Medicaid statute which expanded access to prenatal care and the nature of the exceptions to Section 401(a)'s broad alienage restriction included in Section 401(b) of the Act. They note that the Welfare Reform Act did not amend or restrict any of the provisions of the Medicaid statute that the Second Circuit in *Lewis IV–A* found to demonstrate Congress' intent to expand access to prenatal care. They point out that the Welfare Reform Act left intact the methodology of the constructively born child as a means of determining a pregnant woman's eligibility for Medicaid-sponsored prenatal care.[24] *See* 42 U.S.C. § 1396d(n)(1). Nor does the Act limit other forms of Medicaid coverage aimed at infant health, such as automatic newborn coverage, *see* 42 U.S.C. § 1396a(e)(4); 42 C.F.R. § 435.117; presumptive eligibility for ambulatory prenatal care, *see* 42 U.S.C. §§ 1396a(47) and 1396r–1; and mandatory coordination of Medicaid and WIC benefits, *see id.* §§ 1396a(55) and (c)(2). The Act also continues to allow states to provide benefits under the WIC program to unqualified alien women. *See* 8 U.S.C. § 1615.

Plaintiffs also note that the exceptions in Section 401(b) further suggest that Congress did not intend to compromise the health of United States citizens or children and pregnant women irrespective of their immigration status. Section 401(b)(1)(C) provides an exception for the "testing and treatment of symptoms of communicable diseases whether or not such symptoms are caused by a communicable disease." 8

---

"define a statutory term enacted by a prior Congress." (Pls.' Opp. at 33 n. 14.) They note that the term "emergency medical condition" has been used without relevant amendment since 1986, 42 U.S.C. § 1396b(v)(3), and the old statutory definition was explicitly incorporated by reference into the alien eligibility exception by the Welfare Reform Act, 8 U.S.C. § 1601(b)(1)(A). As the federal defendant observes, however, the Conference Committee was commenting not only on the definition of "emergency medical condition" as that term is used in the Medicaid statute, but also on the scope of the emergency medical care exception created by a *new* statute, the Welfare Reform Act. Accordingly, the Conference Committee's statement is entitled to substantial weight in ascertaining Congress' intent in enacting the new statute.

24. The federal defendant contends that the Second Circuit rejected this Court's reliance in *Lewis IV* on the methodology of the constructively born child when it found that the plain language of OBRA '86 precluded Medicaid benefits for routine prenatal care for non-PRUCOL aliens. The federal defendant, however, misconceives the nature of plaintiffs' reliance on the continued validity of that methodology. Plaintiffs cite its continuing validity only to show that Congress did not intend to limit its continued expansion of access to prenatal care, not to show that the plain language of the Welfare Reform Act explicitly authorizes the provision of routine prenatal care to unqualified aliens or to their fetuses.

U.S.C. § 1611(b)(1)(C). Plaintiffs further note that Congress permitted the states the option to exempt certain federal nutrition programs for pregnant women and children, such as the school lunch and breakfast and WIC programs, from the Act's alien eligibility restrictions. *See* 8 U.S.C. § 1615. Plaintiffs now argue that these exceptions show Congress' continuing concern for the health of children residing in the United States irrespective of their immigration status and a continued congressional policy to ensure that United States citizen children will be born healthy.[25]

Applying similar reasoning, plaintiffs also argue that the federal defendant's interpretation of the Welfare Reform Act conflicts with Congress' continuing intent to curb expenditures. Plaintiffs argue that, by preserving access to the WIC program even as it sought to reduce expenditures on other federal welfare programs and benefits for immigrants, Congress realized that the deprivation of nutrition to pregnant women would undermine the goals of the Act.

There is, of course, no arguing with the fact that Congress, through the adoption of many pieces of legislation in the last twenty years relating to prenatal care, has consistently expanded access to prenatal care and has repeatedly expressed a desire to curb expenditures. *See Lewis IV–A,* 965 F.2d at 1219. Indeed, Congress continued to expand access to prenatal care in the Welfare Reform Act itself by expressly

providing that Section 115 of the Act, which denies certain federal welfare benefits to individuals convicted of certain drug-related offenses, should not be construed to deny federal benefits for prenatal care. *See* Welfare Reform Act § 115(f), 110 Stat. 2105, 2181 (codified at 21 U.S.C. § 862a).

However, Congress' broad purposes cannot be used to trump the plain language of a statute bolstered by a relatively clear expression of intent from the legislative history of the statute under interpretation:

> Application of "broad purposes" of legislation at the expense of specific provisions ignores the complexity of the problems Congress is called upon to address and the dynamics of legislative action. Congress may be unanimous in its intent to stamp out some vague social or economic evil; however, because its Members may differ sharply on the means for effectuating that intent, the final language of the legislation may reflect hard-fought compromises. Invocation of the "plain purpose" of the legislation at the expense of the terms of the statute itself takes no account of the processes of compromise and, in the end, prevents the effectuation of congressional intent.

*Board of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp.,* 474 U.S. 361, 373–74, 106 S.Ct. 681, 88 L.Ed.2d 691 (1986). The "strong presumption" that the plain language of a statute expresses congressional intent is rebutted only in " 'rare and exceptional circumstances,' " where a contrary legislative intent is clearly ex-

---

**25.** Citing the Second Circuit's reasoning in *Lewis IV–A,* plaintiffs argue that this Circuit has previously rejected the argument that Congress' explicit solicitude for the health of children in one part of a statute can be used as a tool to limit benefits for children in another part of the 'statute where there is no explicit language imposing such limits. Plaintiffs specifically note the Second Circuit's finding in *Lewis IV–A* that the inclusion of an explicit exception for Medicaid-sponsored prenatal care in the Immigration Reform and Control Act of 1986 ("IRCA") did not demonstrate Congress' intent to restrict

eligibility for prenatal care in OBRA '86. *See Lewis IV–A,* 965 F.2d at 1218. Plaintiffs also cite the Second Circuit's rejection of the Secretary's argument that Congress' inclusion of an express exception for emergency labor and delivery in OBRA '86 meant that labor and delivery were the only type of prenatal care that Congress wished to extend to aliens. The Second Circuit instead found that any possible redundancy in the coverage was "consistent with Congress's desire to insure that children do not slip through the cracks of prenatal care." *Id.*

pressed. *Ardestani v. INS*, 502 U.S. 129, 135, 112 S.Ct. 515, 116 L.Ed.2d 496 (1991) (quoting *Rubin v. United States*, 449 U.S. 424, 430, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981)); *see also, e.g., Metropolitan Stevedore Co. v. Rambo*, 515 U.S. 291, 295, 115 S.Ct. 2144, 132 L.Ed.2d 226 (1995) (" '[W]hen a statute speaks with clarity to an issue judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished.' "); *Toibb v. Radloff*, 501 U.S. 157, 162, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991) (" 'Where, as here, the resolution of a question of federal law turns on a statute and the intention of Congress, we look first to the statutory language and then to the legislative history if the statutory language is unclear.' ").

■ Applying the very rules of statutory construction employed by the Second Circuit in *Lewis IV–A,* this Court may only legitimately recognize an exception to a broad statutory prohibition where that prohibition "produces an unexpected result and when there is strong reason to doubt that Congress intended that result." *Lewis IV–A*, 965 F.2d at 1215.

Plaintiffs' remaining arguments against the federal defendant's interpretation of Section 401 are also unpersuasive. Citing the cannon of statutory interpretation that courts may "presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts," *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184–85, 108 S.Ct. 1704, 100 L.Ed.2d 158 (1988), plaintiffs argue that Congress needed to explicitly state its intention to overturn

*Lewis IV–A* in order to accomplish that result.

However, plaintiffs' extraordinary suggestion that legislative history must refer to opinions intended to be overturned by citation need not be considered here because the relevant case law, at the time Congress enacted the Welfare Reform Act, was internally inconsistent. *Cf. Cannon v. University of Chicago*, 441 U.S. 677, 696, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). In *Douglas v. Babcock*, 990 F.2d 875 (6th Cir.1993), the Sixth Circuit expressly rejected the Second Circuit's method of statutory interpretation in *Lewis IV–A*:[26]

We have fundamental concerns with the reasoning in *Lewis v. Grinker,* and its applicability to the case before us. The Second Circuit in *Lewis,* instead of focusing on applying the applicable law as written by Congress, instead sought to determine what it deemed Congress's broader "intent." We do not believe our proper judicial role is to divine Congress's unlegislated intent, or to make the statutes comport with what we believe Congress's preferred policy to be, or what it ought to be. Rather, this court must apply the law as written, even when a result is produced that we may personally question. The perceived legislative history of the relevant statutes should not be allowed to trump duly enacted laws even if the "unenacted" legislative policy, intent, or history is clear. Here, the legislative history is far from clear. We are not confident

26. *Douglas* did not expressly address the issue of alien eligibility for prenatal care under OBRA '86. Instead, the Sixth Circuit in *Douglas* considered whether the district court had erred in finding that the plaintiff was ineligible for Medicaid prenatal and postpartum medical benefits on the ground that she failed to cooperate, without good cause, in establishing the paternity of her oldest child and assigning his rights to support, as required by § 1396k of the Medicaid statute. The Sixth Circuit and the district court both found that the plain language of § 1396k precluded Douglas from receiving Medicaid prenatal and postpartum benefits. Douglas,

however, argued that, even if the plain language of the statute rendered her ineligible for those benefits, she should nevertheless receive the benefits because such a reading would frustrate Congress' intent to provide comprehensive Medicaid prenatal care benefits for low-income women. Relying in part on the Second Circuit's decision in *Lewis IV–A*, Douglas urged the Sixth Circuit to focus on the "fundamental congressional goal of promoting prenatal care for low-income women." *Douglas*, 990 F.2d at 877–78. The Sixth Circuit rejected this argument, noting its "fundamental concerns with the reasoning in *Lewis*." *Id.* at 881.

that it would even be possible to discover what Congress's "intent" was respecting the very detailed and complex question presented by this appeal. We decline to follow the approach of *Lewis*.

*Douglas,* 990 F.2d at 881. Moreover, the permanent injunction affirmed by the Second Circuit in *Lewis IV-A* applies only inside New York State. In every other state, even after *Lewis IV-A* was decided, federal Medicaid funds were not being paid (and have not been paid) to provide routine prenatal care to non-PRUCOL or unqualified aliens. (Richardson Aff. ¶ 6). Thus, if Congress was aware that Medicaid funds were being paid to provide routine prenatal care *only* in New York State, Congress could not have considered the Second Circuit's decision in *Lewis IV-A* to be the prevailing understanding of OBRA '86.

Alternatively, plaintiffs argue that the Welfare Reform Act is at least as complex as OBRA '86, if not more so, and that it therefore is even less likely that the 104th Congress specifically considered the Act's effects on the provision of Medicaid for routine prenatal care to unqualified prenatal care. However, the complexity of OBRA '86 only became relevant to the court of appeals because of the absence of a statement such as that included in the Conference Committee Report which cuts through the complexity and alerts the 104th Congress to the fact that Section 401 would result in the denial of prenatal care. *Cf. Lewis IV-A,* 965 F.2d at 1216. Because the legislative history of the Welfare Reform Act, unlike that of OBRA '86, explicitly confronted Congress with the consequences of the Act, this Court may not indulge the presumption that Congress was confused by the Act's complexity. *Cf. id.*

■ In choosing between two possible interpretations of a statute, courts must choose the one, if it exists, that avoids a constitutional conflict. As Justice Brandeis explained:

The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of.... "When the validity of an act of the Congress is drawn into question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided."

*Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 347–48, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) (quoting *Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932)). This rule has, of course, been followed in this circuit. "If a court can decide a case on non-constitutional grounds, it should not stray into the field of constitutional analysis." *FEC v. Central Long Island Tax Reform Immediately Comm.,* 616 F.2d 45, 52 (1980); *see also Occidental Chem. Corp. v. FERC,* 869 F.2d 127 (2d Cir.1989); *Carlin Communications, Inc. v. FCC,* 749 F.2d 113 (2d Cir.1984).

In *Lewis IV,* this Court relied upon the *Ashwander* doctrine to interpret OBRA '86 to permit Medicaid coverage for prenatal care for non-PRUCOL aliens, rather than confront "several complex constitutional issues of first impression." *Lewis IV,* 794 F.Supp. 1202–03. This Court, however, may only avoid such constitutional analysis if another construction of the statute is "fairly possible." Because the plain language of the Welfare Reform Act has the effect of precluding Medicaid coverage for routine prenatal care for unqualified immigrants and because the legislative history of the Act establishes that Congress intended that result, it is not "fairly possible" to construe the Act to permit Medicaid coverage for such prenatal care. As the Supreme Court recently noted:

Statutes should be construed to avoid constitutional questions, but this interpretive canon is not a license for the judiciary to rewrite language enacted by

the legislature.... Any other conclusion, while purporting to be an exercise in judicial restraint, would trench upon the legislative powers vested in Congress by Art. I, § 1, of the Constitution. *Salinas v. United States*, 522 U.S. 52, 118 S.Ct. 469, 475, 139 L.Ed.2d 352 (1997) (quoting *United States v. Albertini*, 472 U.S. 675, 680, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985) (citation omitted)). Here, unlike in *Lewis IV*, this Court cannot say that an alternative construction of the statute is "fairly possible" because Congress has supplied the evidence of its intent that was missing in *Lewis IV*. Any other conclusion would represent "judicial legislation" in derogation of the judicial function. *Cf. Lewis IV-A*, 965 F.2d at 1223.

### Constitutionality of Secretary's Denial of Prenatal Care

Because an alternative construction of Section 401 of the Welfare Reform Act is not "fairly possible," it is necessary to consider the merits of plaintiffs' claim that the Secretary's application of Section 401(a) to deny of Medicaid coverage for non-emergency prenatal care to unqualified pregnant aliens violates the Due Process Clause of the Fifth Amendment.

### Standing

Before proceeding to the merits of plaintiffs' constitutional claims, plaintiffs' standing to raise those claims must be considered. Plaintiffs raise claims on behalf of themselves and on behalf of their citizen children.

■ Plaintiffs clearly have standing under Article III to raise a claim on their own behalf and on behalf of all similarly situated members of the plaintiff class that the Secretary's application of Section 401(a) to deny *them* Medicaid benefits for routine prenatal care would violate *their own* rights to the equal protection of the laws under the Fifth Amendment's Due Process Clause. The "irreducible constitutional minimum of standing" consists of three elements. *Lujan v. Defenders of*

*Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). First, a plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest, which is concrete and particularized, and actual and imminent, not conjectural or hypothetical. *See id.* at 560, 112 S.Ct. 2130; *see also, e.g., Raines v. Byrd*, 521 U.S. 811, 819, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) ("We have consistently stressed that a plaintiff's complaint must establish that he has a 'personal stake' in the alleged dispute, and that the alleged injury suffered is particularized to him."); *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). Second, the injury must be "fairly traceable to the defendant's allegedly unlawful conduct." *Allen*, 468 U.S. at 751, 104 S.Ct. 3315. Third, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130 (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)).

■ As a result of the Secretary's application of Section 401(a) of the Welfare Reform Act to them, the members of the plaintiff class will suffer a concrete injury, the denial of Medicaid benefits for routine prenatal care, which is caused by the conduct of the Secretary and which can be redressed by the continuation of this Court's injunction. It is not disputed that, as a result of the Secretary's denial of prenatal care to unqualified pregnant aliens, significant numbers of the children of the members of the plaintiff class will be born with severe and potentially lifelong birth defects. The members of the plaintiff class thus have a direct and personal interest in this litigation; they will bear the primary economic, social, and emotional burdens of caring for these children. As stated in *Lewis IV*, "the burden of caring for a deformed child may demand such time and resources from its parents as to prevent them from otherwise leading economically productive lives." *Lewis IV*, 794

F.Supp. at 1202. Moreover, "a parent has his or her own direct, legally cognizable interest in preserving the highest level of health for his or her child." *Public Citizen v. FTC*, 869 F.2d 1541, 1550 (D.C.Cir. 1989); *cf. Parham v. J.R.*, 442 U.S. 584, 600–04, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979) (discussing "parent's interest in and obligation for the welfare and health of the child"); *Wisconsin v. Yoder*, 406 U.S. 205, 232, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) ("The history and culture of Western civilization show a strong tradition of parental concern for the nurture and upbringing of their children."). Such a showing of injury more than suffices to meet concerns about plaintiffs' constitutional standing.

Plaintiffs, however, also ask this Court to consider the injuries that will be sustained by their citizen children as a result of the Secretary's application of Section 401(a) to deny them Medicaid coverage for prenatal care, and indeed this claim, which involves disparate treatment of United States citizens, is, for reasons discussed hereinafter, the basis on which I conclude that the statute is unconstitutional.

The federal defendant responds initially to this claim that plaintiffs do not have standing under Article III to assert a constitutional claim on behalf of their unborn citizen children because, under the Supreme Court's decision in *Roe v. Wade*, 410 U.S. 113, 157–59, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), a fetus is not a "person" entitled to the equal protection of the laws under the Fifth or Fourteenth Amendments. Since a fetus is not a person, or in being, it does not itself have standing and a *fortiori* neither does the mother.

The question of whether a fetus is a "person" entitled to equal protection under the Fifth Amendment is, however, not dispositive in this case and the federal defendant's citation to *Roe* is inapposite. Whether or not plaintiffs may assert an equal protection claim on behalf of their unborn children, they clearly may assert an equal protection claim on behalf of their already-born citizen children,[28] and it is essentially on that claim that they are entitled to prevail in this lawsuit.

These citizen children themselves have standing to claim that the Secretary's application of Section 401(a) to deny their alien mothers Medicaid coverage for routine prenatal care denies them equal protection because they have suffered an injury-in-fact which is directly traceable to the Secretary's conduct and to claim that this injury is likely to be redressed by this Court's continuation of the permanent injunction. The Medicaid statute provides that newborn children are automatically eligible for Medicaid in their own name on the date of their birth if their mothers were eligible for Medicaid-sponsored prenatal care.[29] 42 U.S.C. § 1396a(e)(4)

---

**28.** The plaintiff class in this action, as it is currently defined, includes "all aliens residing in New York State who have applied or attempted to apply for Medicaid benefits but have been or would be denied on the basis of their alienage." *Lewis I*, 663 F.Supp. at 1170–71. The plaintiff class, thus, is not limited to alien women who are pregnant, and this Court may, accordingly, assume that a substantial number of these women have given birth to their children in the United States.

**29.** Section 1396a(e)(4) provides, in pertinent part:
A child born to a woman eligible for and receiving medical assistance under a State plan on the date of the child's birth shall be deemed to have applied for medical assistance and to have been found eligible for

such assistance under such plan on the date of such birth and to remain eligible for such assistance for a period of one year so long as the child is a member of the woman's household and the woman remains (or would remain if pregnant) eligible for such assistance.
42 U.S.C. § 1396a(e)(4); *see also* 42 C.F.R. § 435.117 ("The agency must provide categorically needy Medicaid eligibility to a child born to a woman who is eligible as categorically needy and is receiving Medicaid on the date of the child's birth. The child is deemed to have applied and been found eligible for Medicaid on the date of birth and remains eligible as categorically needy for one year so long as the woman remains eligible as categorically needy and the child is a member of the woman's household.").

(West Supp.1999); 42 C.F.R. § 435.117 (1999). Thus, if the Secretary considers a pregnant alien ineligible for Medicaid-sponsored prenatal care under the alien-age restriction in Section 401(a) of the Welfare Reform Act, then the child of such an unqualified alien who is born in the United States will not be automatically eligible for Medicaid on the date of its birth while the child of a citizen mother considered eligible for Medicaid-sponsored prenatal care will be eligible for Medicaid at birth. Both children, however, are United States citizens.[30] The citizen child of an unqualified alien woman thus may assert a claim that the Secretary's application of Section 401(a) to deny his or her alien mother Medicaid coverage for routine prenatal care results in discrimination against the citizen child on the basis of the alienage status of its mother, discrimination that, as noted below, clearly violates the child's right to equal protection under the Fifth Amendment.[31]

This disparate treatment on the basis of the alienage of the mother is not eliminated by the fact that the Medicaid statute permits the newborn citizen child of an alien mother to apply for Medicaid in his or her own name, or that, if and when the newborn child is determined to be eligible, the Medicaid statute provides that any award is retroactive to the date of the child's application, because significant disparities in application procedure and coverage still remain. First, under 42 C.F.R. § 435.914, retroactivity only extends back three months prior to the application for Medicaid. See 42 C.F.R. § 435.914 (1999) ("The agency must make eligibility for Medicaid effective no later than the third month before the month of the application."). Thus, if the newborn citizen child of an unqualified alien mother applies for Medicaid more than three months after its birth, the child will not be eligible retroactively for Medicaid coverage for post-birth medical expenses. By contrast, the child of an otherwise eligible citizen mother will be automatically eligible for Medicaid coverage for all expenses for one year without need to apply for such benefits. Of course, the impact of a lack of immediate Medicaid coverage for post-birth expenses is very real, and not at all academic, since another result of the Secretary's application of Section 401(a) to deny Medicaid coverage for routine prenatal care to unqualified pregnant aliens will be the imposition of birth defects and other severe and potentially lifelong physical and mental disabilities on a significant number of the citizen children born to the members of the plaintiff class.[32]

Nor is the standing of the mothers and their children any less because of the contingencies cited by the federal defendant which might, on the one hand, have spared the child all of the injuries to be feared from lack of prenatal or post-natal care to the child's mother or which might, on the other hand, have destroyed the legal claim of the child to relief from this Court. It is, of course, possible that the child of an

---

**30.** This "anomaly" in the Medicaid statutory scheme was noted by the Second Circuit in *Lewis IV–A,* 965 F.2d at 1217–18 ("Further, construing OBRA '86 to terminate prenatal care for non-PRUCOL pregnant women creates an anomaly in another section of the statute."). The statutory and regulatory provisions regarding automatic eligibility for newborn children remain essentially unchanged since the date of the Second Circuit's decision in *Lewis IV–A.*

**31.** In *Lewis IV–A,* the Second Circuit also noted the possibility that the citizen children of the plaintiff class could assert such an equal protection claim. *See Lewis IV–A,* 965

F.2d at 1217 ("Such discrimination against the citizen child on the basis of the alien status of the parent would raise serious equal protection questions.").

**32.** Despite the recent legislative shift from a fetal-centered to a maternal-centered approach in the provision of prenatal care, *see Lewis IV–A,* 965 F.2d at 1208–11, it is clear that prenatal care is principally designed to ensure the health of the child at its birth and thereafter. *Cf. Lewis IV–A,* 965 F.2d at 1218 ("[P]renatal care principally benefits the fetus.").

unqualified alien woman may be stillborn [33] or come through birth unscathed and not in need of Medicaid coverage. It was also possible, although not likely, that the child might not have been born in this country because the unqualified alien woman might have left the United States while pregnant and failed to return before the birth of her child. So too the federal defendant might have been more successful than it has in the past in its ongoing efforts to remove all unqualified aliens, whether pregnant or not, from the country. These contingencies, which make it possible that some portion of those potentially threatened with injury by the statute will escape injury, do not lessen the standing of that substantial number of the children of these aliens who will be born in this country and will, as a result, be citizens entitled to the protections of the United States Constitution at the moment of their birth and will be denied those protections as a result of the operation of this statute.

Some children will be born without birth defects despite the lack of prenatal care

and grow up as healthy United States citizens. However, it is also indisputable that a significant number of citizen children will suffer from the lack of prenatal care provided to the alien mothers, and some appreciable number of young citizen children will undergo lifelong physical or mental disabilities as a direct result of the Secretary's application of the statute. As discussed in greater detail hereinafter, the imposition of such disabilities upon innocent citizen children solely on the basis of the alienage of their mothers "does not comport with fundamental conceptions of justice." *Plyler*, 457 U.S. at 220, 102 S.Ct. 2382.[34] Crucial here is the fact that there *now* exist citizen children of members of the plaintiffs' class who *will* be harmed by the application of the law because they will be eligible for post-natal care on terms inferior to those enjoyed by similarly situated children of qualified mothers.

A question, of course, remains whether the plaintiff mothers have standing to raise the third-party rights of their citizen children.[35] "Ordinarily, one may not claim

---

**33.** A possibility made cruelly and ironically more likely if the mother is denied prenatal care.

**34.** A complex but ultimately unnecessary argument may be made that the citizen children may not only assert claims based on the fact that they will be denied Medicaid coverage at birth for no reason except their mother's alienage but that they may also assert claims based on the disparate treatment of their mothers prior to their birth which resulted in birth defects and other disabilities to them, the children. In *Crumpton v. Gates*, 947 F.2d 1418, 1422–23 (9th Cir.1991), the Ninth Circuit held that a child could maintain an action under 42 U.S.C. § 1983 for unwarranted interference with his rights to familial companionship and society based upon the Los Angeles Police Department's allegedly unlawful killing of his father when he was a two-month-old fetus *en ventre sa mere*. *See id.* at 1423. *But see Ruiz Romero v. Gonzalez Caraballo*, 681 F.Supp. 123, 125–26 (D.P.R.1988) (fetus is not a "person" for § 1983 purposes and, thus, may not maintain § 1983 suit for injuries sustained *en ventre sa mere* as a result of police brutality against mother); *Harman v. Daniels*, 525 F.Supp. 798, 800–01 (W.D.Va. 1981) (same). The Ninth Circuit reasoned that, because Crumpton was a fetus at the

time his father was killed, the unwarranted state interference with his right to familial relationships, and his cause of action for that injury arose at his birth. *See Crumpton*, 947 F.2d at 1422.

**35.** There may be some question as to whether the third-party rights of the born citizen children of the members of the plaintiff class were sufficiently pleaded in the complaint to justify this Court's attention. Plaintiffs' submissions in connection with the federal defendant's motion, however, expressly ask this Court to consider the harm inflicted upon their citizen children at their birth when determining whether the Secretary's denial of prenatal care violates the Fifth Amendment's Due Process Clause. Moreover, the third-party argument follows from plaintiffs' reliance on the reasoning of *Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982). Since both sides have now recognized that the issue is now in litigation and have fully addressed the merits, it is, accordingly, appropriate to consider the third-party rights of the citizen children of the members of the plaintiff class. *Cf. Irving v. Clark*, 758 F.2d 1260, 1267 n. 11 (1985), *aff'd sub nom. Hodel v. Irving*, 481 U.S. 704, 107 S.Ct. 2076, 95 L.Ed.2d 668 (1987).

standing ... to vindicate the rights of some third party." *Barrows v. Jackson,* 346 U.S. 249, 255, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953). This limitation on a litigant's ability to raise the rights of a third-party, or *jus tertii,* is "not constitutionally mandated." *Craig v. Boren,* 429 U.S. 190, 193, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). Rather, the doctrine is a prudential " 'rule of self-restraint' designed to minimize unwarranted intervention into controversies where applicable constitutional questions are ill-defined and speculative." *Craig,* 429 U.S. at 193, 97 S.Ct. 451. The general prudential rule, however, may be relaxed where its underlying justifications are absent. *See Singleton v. Wulff,* 428 U.S. 106, 114, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976).

■ A litigant generally may bring an action on behalf of a third party if "three important criteria are satisfied": (i) first, the litigant "must have suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute"; (ii) second, "the litigant must have a close relation to the third party"; and (iii) third, "there must exist some hindrance to the third party's ability to protect his or her own interests." *Powers v. Ohio,* 499 U.S. 400, 410–11, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (citing *Singleton,* 428 U.S. at 112–16, 96 S.Ct. 2868); *see also Campbell v. Louisiana,* 523 U.S. 392, 118 S.Ct. 1419, 1422–23, 140 L.Ed.2d 551 (1998) (applying three prerequisites for third-party standing set forth in *Powers* ).

■ Here, as explained above, plaintiffs have suffered a concrete injury in fact. With respect to the second factor, plaintiffs' interests are inextricably linked to the rights of their citizen children and are equally as intense. Plaintiffs' right to obtain Medicaid coverage for routine prenatal care is involved *pari passu* with the rights of their children to be considered automatically eligible for Medicaid coverage for post-birth care and expenses.

Moreover, as other courts have observed, the relationship between a parent and child is much closer than those involved in other cases in which third-party standing has been found to exist, for example, the relationship between a physician and patient, *Singleton,* 428 U.S. at 117, 96 S.Ct. 2868; *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), or that between a beer vendor and a class of potential purchasers of the product, *Craig,* 429 U.S. at 195–96, 97 S.Ct. 451. The relationship between parent and child has been deemed to be "more than sufficient to address the concerns that underlie the prudential doctrine" of third-party standing. *Elias v. United States Dep't of State,* 721 F.Supp. 243, 246–47 (N.D.Cal.1989). Other courts have permitted a child to assert his or her parent's equal protection rights in challenging the validity of statutes that conferred United States citizenship on the foreign-born offspring of United States citizen fathers, but not United States citizen mothers, *see Wauchope v. United States Dep't of State,* 985 F.2d 1407, 1411 (9th Cir.1993); *Elias,* 721 F.Supp. at 246–47, or which chilled the parent's right to adopt a child, *Lindley ex rel. Lindley v. Sullivan,* 889 F.2d 124, 129 (7th Cir.1989); *see also Irving v. Clark,* 758 F.2d 1260, 1267–68 (8th Cir.1985) (finding that heir and devisee had third-party standing to assert Fifth Amendment rights of her decedent in challenging the constitutionality of Indian Land Consolidation Act), *aff'd sub nom. Hodel v. Irving,* 481 U.S. 704, 107 S.Ct. 2076, 95 L.Ed.2d 668 (1987). Further, the effectiveness of a parent's representation of his or her child is reflected in the well-established tradition that permits parents to sue as the representatives of their minor children and to "maintain litigation that rests directly on the standing of the children themselves." 13 Wright *et al.,* Federal Practice and Procedure: Jurisdiction 2d § 3531.9 (2d ed.1984); *see also, e.g., Sherman v. Community Consol. Sch. Dist. 21,* 980 F.2d 437, 441 (7th Cir.1992) (finding that

father had derivative standing to sue as child's guardian).

Finally, with regard to the ability of the third party to assert his or her own right, the answer is obvious. The citizen children of the members of the plaintiff class are minor children, many of whom will suffer from physical and mental disabilities as a result of birth defects caused by the Secretary's denial of prenatal care to their mothers, and, thus, are unable to effectively assert their own interests. The Secretary's provision of Medicaid coverage for prenatal care to their alien mothers is vital to the citizen children's ability to obtain automatic eligibility for Medicaid at birth.

Accordingly, this Court finds that plaintiffs have satisfied the prerequisites of third-party standing set forth in *Powers* and have standing to assert the Fifth Amendment equal protection rights of their citizen children. I turn therefore to the constitutionality of the Secretary's application of Section 401(a) of the Welfare Reform Act to deny Medicaid coverage for routine prenatal care to their unqualified alien mothers as it impacts their citizen children at the moment of their birth.

### Equal Protection Challenge
### Level of Review

■ The Fifth Amendment to the United States Constitution provides that "[n]o person shall be ... deprived of life, liberty, or property without due process of law." U.S. Const. amend. V. While the Fifth Amendment contains no equal protection clause, "[t]he concept of equal justice under the law is served by the Fifth Amendment's guarantee of due process, as well as by the Equal Protection Clause of the Fourteenth Amendment." *Hampton v. Mow Sun Wong*, 426 U.S. 88, 100, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976) ("*Hampton I*"); *see also Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975). It is also settled law that aliens, whether lawfully or unlawfully

present in this country, are persons entitled to protection under the Fifth and Fourteenth Amendments. *See Mathews v. Diaz*, 426 U.S. 67, 77, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976) (Fifth Amendment); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596, 73 S.Ct. 472, 97 L.Ed. 576 (1953) (Fifth Amendment); *Wong Yang Sung v. McGrath*, 339 U.S. 33, 48, 70 S.Ct. 445, 94 L.Ed. 616, *modified*, 339 U.S. 908, 70 S.Ct. 564, 94 L.Ed. 1336 (1950) (Fifth Amendment); *Graham v. Richardson*, 403 U.S. 365, 371, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971) (Fourteenth Amendment); *Wong Wing v. United States*, 163 U.S. 228, 238, 16 S.Ct. 977, 41 L.Ed. 140 (1896) (Fifth Amendment).

While similar analyses are utilized for equal protection claims under the Fifth and Fourteenth Amendments,[36] the "two protections are not always coextensive." *Hampton I*, 426 U.S. at 100, 96 S.Ct. 1895. "Not only does the language of the two Amendments differ, but more importantly, there may be overriding national interests which justify selective federal legislation that would be unacceptable for an individual State." *Id.*

Congress, of course, has broad plenary authority over matters of immigration and naturalization, and in exercising this authority, Congress has the power to treat aliens differently from citizens and "regularly makes rules that would be unacceptable if applied to citizens." *Mathews*, 426 U.S. at 80, 96 S.Ct. 1883. Because of this broad authority to regulate aliens' entry to, and the conditions under which they may remain in this country, the role of the Judiciary in reviewing congressional action related to immigration matters is very limited. *See, e.g., Fiallo v. Bell*, 430 U.S. 787, 796, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977); *Kleindienst v. Mandel*, 408 U.S. 753, 768–70, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972). The federal defendant thus argues, relying

---

**36.** Both Amendments essentially require that persons similarly situated be treated alike. *See, e.g., F.S. Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920).

primarily on *Mathews v. Diaz*, 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976), that this Court may apply only the rational basis or a highly deferential standard of review to determine the constitutionality of the Secretary's application of Section 401(a) of the Welfare Reform Act to deny Medicaid coverage for routine prenatal care to unqualified pregnant aliens. Relying primarily on the reasoning of *Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982), plaintiffs argue that the Secretary's application of the alienage restriction in Section 401(a) should be subjected to heightened scrutiny because the classification will result in the imposition of severe and lifelong burdens on a discrete class of innocent citizen children unaccountable for their disabling status.[37]

In order to properly evaluate the arguments of the parties, it is helpful first to consider the broader context of constitutional treatment of immigration measures and alienage c lassifications.[38] The Supreme Court has long held that " 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Fiallo*, 430 U.S. at 792, 97 S.Ct. 1473 (quoting *Oceanic Steam Co. v. Stranahan*, 214 U.S. 320, 339, 29 S.Ct. 671, 53 L.Ed. 1013 (1909)); *see also Landon v. Plasencia*, 459 U.S. 21, 34, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982) ("[C]ontrol over matters of immigration is a sovereign prerogative, largely within the control of the executive and the legisla-

ture."); *Mathews*, 426 U.S. at 81, 96 S.Ct. 1883 ("For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government."). The Court has "long recognized the power to expel or include aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control."[39] *Shaughnessy v. Mezei*, 345 U.S. 206, 210, 73 S.Ct. 625, 97 L.Ed. 956 (1953); *see, e.g., Fiallo*, 430 U.S. at 787, 97 S.Ct. 1473; *Harisiades v. Shaughnessy*, 342 U.S. 580, 72 S.Ct. 512, 96 L.Ed. 586 (1952); *Lem Moon Sing v. United States*, 158 U.S. 538, 15 S.Ct. 967, 39 L.Ed. 1082 (1895); *Fong Yue Ting v. United States*, 149 U.S. 698, 13 S.Ct. 1016, 37 L.Ed. 905 (1893); *Chae Chan Ping v. United States*, 130 U.S. 581, 9 S.Ct. 623, 32 L.Ed. 1068 (1889). "Since decisions in these matters may implicate our relations with foreign powers, and since a wide variety of classifications must be defined in light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary." *Mathews*, 426 U.S. at 81, 96 S.Ct. 1883.

The Supreme Court has consistently applied general principles such as these to preclude or limit sharply judicial review of

---

**37.** Because it is well established that no individual, whether citizen or alien, has a fundamental right to federal public welfare benefits, plaintiffs do not suggest—nor could they successfully—that strict scrutiny of the legislative classification is warranted because the statute interferes with a fundamental right. *See Weinberger v. Salfi*, 422 U.S. 749, 768–70, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975); *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

**38.** Judge Kaplan's opinion in *Abreu v. Callahan*, 971 F.Supp. 799, 808–12 (S.D.N.Y.1997), provides an excellent summary of the plenary immigration power and judicial treatment of alienage classifications.

**39.** The Supreme Court has acknowledged that federal authority to regulate the status of aliens derives from various sources, including the federal government's power "[t]o establish a uniform Rule of Naturalization," U.S. Const. Art. I, § 8, cl. 4, its power "[t]o regulate Commerce with foreign Nations," *id.* cl. 3, and its broad authority over foreign affairs, *see Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89, 72 S.Ct. 512, 96 L.Ed. 586 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government."). *See generally Toll v. Moreno*, 458 U.S. 1, 10, 102 S.Ct. 2977, 73 L.Ed.2d 563 (1982).

congressional actions relating to immigration and naturalization.[40] *See, e.g., Fiallo*, 430 U.S. at 792, 97 S.Ct. 1473 ("[I]t is important to underscore the limited scope of judicial inquiry into immigration legislation."); *Mathews*, 426 U.S. at 82, 96 S.Ct. 1883; *Harisiades*, 342 U.S. at 588–89, 72 S.Ct. 512. While the standard applied in recent years has been phrased in slightly differing language, it remains highly deferential.[41] The Court's most recent formulation states that congressional action within the scope of its plenary powers is subject to rational basis review. *See Reno v. Flores*, 507 U.S. 292, 306, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993); *accord Azizi v. Thornburgh*, 908 F.2d 1130, 1133 & n. 2 (2d Cir.1990); *Abreu v. Callahan*, 971 F.Supp. 799, 809 (S.D.N.Y.1997).

Accordingly, the lower federal courts have uniformly applied the rational basis standard of review or its substantial equivalent in considering Fifth Amendment equal protection challenges to federal laws that regulate aliens. *See, e.g., United States v. Lue*, 134 F.3d 79, 86–87 (2d Cir.

1998); *Moving Phones Partnership v. Federal Communications Commission*, 998 F.2d 1051, 1056 (D.C.Cir.1993), *cert. denied sub nom. Cellswitch v. FCC*, 511 U.S. 1004, 114 S.Ct. 1369, 128 L.Ed.2d 46 (1994); *Azizi*, 908 F.2d at 1133; *Sinelnikov v. Shalala*, No. 97 C 4884, 1998 WL 164889, at *11 (N.D.Ill. Mar.31, 1998), *aff'd*, 189 F.3d 598 (7th Cir.1999); *Kiev v. Glickman*, 991 F.Supp. 1090, 1099 (D.Minn.1998); *Rodriguez v. United States*, 983 F.Supp. 1445, 1457 (S.D.Fla. 1997), *aff'd*, 169 F.3d 1342 (11th Cir.1999); *Abreu*, 971 F.Supp. at 815.

In *Mathews v. Diaz*, 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976), the Court considered a Fifth Amendment equal protection challenge to a federal statute that granted eligibility for Medicare Part B supplemental benefits to resident citizens who were sixty-five years or older but denied eligibility to comparable aliens unless they had been admitted for permanent residence and had resided in the United States for at least five years.[42] *See id.* at 69, 96 S.Ct. 1883.

**40.** While the Court on occasion has evidenced discomfort with its sweeping terms, the Court has continued to ascribe undiminished validity to the plenary power doctrine. Writing for the Court in *Galvan v. Press*, 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911 (1954), Justice Frankfurter noted that "much could be said for the view, were we writing on a clean slate," that the Due Process Clause places some limitations on congressional power in the immigration area. *Id.* at 530–31, 74 S.Ct. 737. Nevertheless, he went on to state:

But the slate is not clean. As to the extent of the power of Congress under review, there is not merely 'a page of history,' . . . but a whole volume. Policies pertaining to the entry of aliens and their right to remain here are peculiarly concerned with the political conduct of government. In the enforcement of these policies, the Executive Branch of the Government must respect the procedural safeguards of due process. . . . But that the formulation of these policies is entrusted exclusively to Congress has become about as firmly embedded in the legislative and judicial tissues of our body politic as any aspect of our government. . . .

We are not prepared to deem ourselves wiser or more sensitive to human rights than our predecessors, especially those who

have been most zealous in protecting civil liberties under the Constitution and must therefore under our constitutional system recognize congressional power in dealing with aliens. . . .

*Id.* at 531–32, 74 S.Ct. 737; *see also Fiallo*, 430 U.S. at 792 n. 4, 97 S.Ct. 1473 ("We are no more inclined to reconsider this line of cases today than we were five years ago when we decided *Kleindienst v. Mandel*, 408 U.S. 753, 767, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972).").

**41.** *See Mathews*, 426 U.S. at 83, 96 S.Ct. 1883 ("not wholly irrational"); *Hampton I*, 426 U.S. at 101 n. 21, 96 S.Ct. 1895 ("largely immune from judicial control"); *Kleindienst*, 408 U.S. at 770, 92 S.Ct. 2576 (law must be supported by facially legitimate and bona fide reason); *Shaughnessy*, 345 U.S. at 210, 73 S.Ct. 625 ("subject only to narrow judicial review").

**42.** The Medicare Part B medical insurance program for the aged, defined as persons sixty-five years or older, covers a part of the cost of certain physicians' services, home health care, outpatient physical therapy, and other medical care. *See Mathews*, 426 U.S. at 70 n.

After recognizing that aliens are persons entitled to the protections of the Fifth Amendment, the Court went on to state:

The fact that all persons, aliens and citizens alike, are protected by the Due Process Clause does not lead to the further conclusion that all aliens are entitled to enjoy all the advantages of citizenship or, indeed, to the conclusion that all aliens must be placed in a single homogenous legal classification. For a host of constitutional and statutory provisions rest on the premise that a legitimate distinction between citizens and aliens may justify attributes and benefits for one class not accorded to the other, and the class of aliens is itself a heterogeneous multitude of persons with a wide-ranging variety of ties to this country.

*Id.* at 78–79, 96 S.Ct. 1883. The Court then recognized that Congress, "[i]n the exercise of its broad power over naturalization and immigration, . . . regularly makes rules that would be unacceptable if applied to citizens" and that a distinction by Congress between citizens and aliens "does not in itself imply that such disparate treatment is 'invidious.'" *Id.* at 80, 96 S.Ct. 1883.

That said, however, the Court focused on the fact that the legislative classification at issue in *Mathews* did not in fact distinguish between citizens and aliens. Rather, the statute classified aliens into two groups—one eligible for a federal benefit program and one not. The Court thus narrowly framed the question presented by the plaintiffs' challenge to the classification as follows: "The real question presented by this case is not whether discrimination between citizens and aliens is permissible; rather, it is whether the statutory discrimination within the class of aliens—allowing benefits to some aliens

but not to others—is permissible." *Id.* at 80, 96 S.Ct. 1883.

Before considering this question, the Court noted the special importance of broad deference to the legislative and executive branches in matters affecting aliens under the plenary power doctrine, stating:

For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government. Since decisions in these matters may implicate our relations with foreign powers, and since a wide variety of classifications must be defined in light of the changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or to the Executive than to the Judiciary. . . . Any rule of constitutional law that would inhibit the flexibility of the political branches of government to respond to changing world conditions should be adopted only with the greatest caution. The reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization.

*Id.* at 81, 96 S.Ct. 1883. The Court went on to define the scope of its deferential standard of review as applied to the challenged classification as follows:

Since it is obvious that Congress has no constitutional duty to provide all aliens with the welfare benefits provided to citizens, the party challenging the constitutionality of the particular line Congress has drawn has the burden of advancing principled reasoning that will at once invalidate that line and yet tolerate

1, 96 S.Ct. 1883 (citing 42 U.S.C. § 1395k (1970 ed. & Supp. IV)). The program supplements the Medicare Part A hospital insurance plan, §§ 1811 *et seq.* of the Social Secu-

rity Act of 1935, 49 Stat. 620, as added 79 Stat. 291, and as amended 42 U.S.C. §§ 1395c *et seq.* (1970 ed. & Supp. IV). *See Mathews,* 426 U.S. at 70 n. 1, 96 S.Ct. 1883.

a different line separating some aliens from others. .

*Id.* at 82, 96 S.Ct. 1883. Applying that standard to the lines Congress had drawn in providing that only certain aliens were eligible for Medicare Part B supplemental benefits, a unanimous Court concluded that the classification was constitutionally permissible because it was not "wholly irrational." *Id.* at 83, 96 S.Ct. 1883. The Court went on to state:

> The task of classifying persons for medical benefits, like the task of drawing lines for federal tax purposes, inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line; the differences between the eligible and the ineligible are differences in degree rather than differences in the character of their respective claims. When this kind of policy choice must be made, we are especially reluctant to question the exercise of congressional judgment. In this case, since appellees have not identified a principled basis for prescribing a different standard of review than the one selected by Congress, they have, in effect, merely invited us to substitute our judgment for that of Congress in deciding which aliens shall be eligible to participate in the supplementary insurance program upon the same conditions as citizens. We decline the invitation.

*Id.* at 83–84, 96 S.Ct. 1883.

While the Court conceded that the strict scrutiny standard applies to Fourteenth Amendment equal protection challenges to state classifications of aliens, *see, e.g., Graham v. Richardson,* 403 U.S. 365, 372, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), it rejected the argument that strict scrutiny also applies to Fifth Amendment equal protection challenges to federal classifications of aliens. The Court explained, "the Fourteenth Amendment's limits on state powers are substantively different from the constitutional provisions applicable to the federal power over immigration and naturalization." *Mathews,* 436 U.S. at 86–87, 98 S.Ct. 1690. This difference obtains because "it is the business of the political branches of the Federal Government, rather than that of ... the States ... to regulate the conditions of entry and residence of aliens. The equal protection analysis also involves significantly different considerations because it concerns the relationship between aliens and the States rather than between aliens and the Federal Government." *Id.* at 84–85, 98 S.Ct. 1690. Thus, the Court concluded, it is appropriate to apply strict scrutiny when reviewing a state legislative classification based on alienage, but to apply the considerably narrower "wholly irrational" or rational basis standard when reviewing a comparable classification by the federal government. *Id.* at 86–87, 98 S.Ct. 1690.

The federal defendant argues that *Mathews* controls the determination of the proper standard of review in this case. In support of this contention, the federal defendant observes that the other lower federal courts which have considered equal protection challenges to the provisions of the Welfare Reform Act that restrict qualified aliens' eligibility for certain federal welfare programs have found *Mathews* controlling and, accordingly, have uniformly applied a rational basis standard of review. *See Kiev v. Glickman,* 991 F.Supp. 1090, 1093–99 (D.Minn.1998) (Section 402 of the Welfare Reform Act); *Sinelnikov v. Shalala,* No. 1998 WL 164889, at *11 (same); *Rodriguez v. United States,* 983 F.Supp. 1445, 1453–57 (S.D.Fla.1997), *aff'd,* 169 F.3d 1342 (11th Cir.1999) (same); *Abreu v. Callahan,* 971 F.Supp. 799, 806–15 (S.D.N.Y.1997) (same). In each of these cases, lawful permanent resident or other legal aliens disqualified from receiving food stamps or supplemental security income benefits as a result of the citizenship requirement included Section 402 of the Welfare Reform Act, 8 U.S.C. § 1612,

claimed that Section 402 violated their Fifth Amendment rights to equal protection.[43] *See Kiev,* 991 F.Supp. at 1090; *Sinelnikov,* 1998 WL 164889, at \*1; *Rodriguez,* 983 F.Supp. at 1445; *Abreu,* 971 F.Supp. at 799. In each of these cases, the courts found that the restrictions in Section 402 of the Welfare Reform Act on the eligibility of qualified aliens for certain federal welfare programs, like the legislative classification at issue in *Mathews,* discriminate among categories of aliens, rather than against aliens generally. Instead of distinguishing between citizens and aliens generally, Section 402 of the Welfare Reform Act, like the statute at issue in *Mathews,* provides that certain qualified aliens are eligible for certain federal welfare programs while other qualified aliens are not. These courts have thus found Section 402 of the Welfare Reform Act to be an exercise of Congress' broad plenary power to draw legitimate distinctions between different categories of aliens in the allocation of federal public welfare benefits which warrants only rational basis scrutiny.

■ In determining the proper level of scrutiny to be applied in this case, this Court must distinguish between the equal protection claims brought by plaintiffs on their own behalf and those brought by plaintiffs on behalf of their born citizen children. In short, heightened scrutiny applies for claims arising from the rights of the citizen children while only rational basis analysis obtains for claims brought by plaintiffs on their own behalf.

The Supreme Court has consistently rejected the claim that illegal or undocumented aliens may be considered a "suspect class" for the purposes of equal protection analysis. *See Plyler,* 457 U.S. at 219 n. 19, 102 S.Ct. 2382 ("Unlike most of the classifications that we have recognized as suspect, entry into this class, by virtue of entry into this country, is the product of voluntary action. Indeed, entry into the class is itself a crime."). "Persuasive arguments support the view that a State may withhold its beneficence from those whose very presence within the United States is the product of their own unlawful conduct." *Plyler,* 457 U.S. at 219, 102

---

**43.** Section 402 provides that an alien who is a "qualified alien," as defined in 8 U.S.C. § 1641, is not eligible for the following federal programs, with certain limited exceptions: (1) the Supplemental Security Income program ("SSI"), 42 U.S.C. §§ 1381 *et seq.* (providing income assistance for individuals who are 65 years or older or are blind or disabled); (2) the Food Stamp Program, 7 U.S.C. §§ 2011 *et seq.* (providing coupons to purchase food to eligible households in order to help establish and maintain adequate levels of nutrition); (3) the Temporary Assistance for Needy Families program ("TANF"), 42 U.S.C. §§ 601 *et seq.* (permitting, as successor to the AFDC program, the states to provide time-limited assistance to qualifying families); (4) the Medicaid program, 42 U.S.C. §§ 1396 *et seq.;* and (5) the Social Services Block Grant program ("SSBG"), 42 U.S.C. §§ 1397 *et seq.* (providing consolidated funds to the states to forward their policy goals, such as the prevention of dependency, neglect, abuse, and exploitation of children and adults, and inappropriate institutional care). *See* Welfare Reform Act § 402(a)(1), (3); 8 U.S.C. § 1612(a)(1), (3). Section 402(a)(2) provides that certain qualified aliens remain eligible for these federal programs, including the fol-

lowing groups: (i) refugees; (ii) asylees; (iii) certain aliens who have had their deportation withheld; (iv) aliens who were granted status as Cuban or Haitian entrants; (v) certain Amerasians; (vi) lawful permanent resident aliens who have worked 40 qualifying quarters; and (vii) legal aliens who were honorably discharged or are on active duty with the Armed Forces. *See* Welfare Reform Act § 402(a)(2); 8 U.S.C. § 1612(a)(2). In addition, through recent amendments to the Welfare Reform Act, Congress provided that certain qualified aliens remain eligible for Social Security benefits alone, including the following groups: (1) legal aliens receiving SSI benefits on August 22, 1996; (2) blind or disabled aliens lawfully residing in the United States on August 22, 1996; (3) certain American Indians; (4) certain SSI beneficiaries who are receiving benefits pursuant to applications that were filed before January 1, 1979; (5) aliens who on August 22, 1996, were lawfully residing in the United States and were sixty-five years or older; (6) aliens who are minor children and who were lawfully residing in the United States on August 22, 1996; and (7) certain Hmong and Highland Laotians. *See* 8 U.S.C. § 1612(a)(2)(E)–(K).

S.Ct. 2382.[44] As the federal defendant notes, plaintiffs may not rely on the reasoning of *Plyler* to support their own claims that the Secretary's application of Section 401(a) violates their own Fifth Amendment rights to equal protection because they, unlike the undocumented alien children who formed the plaintiff class in *Plyler*, are at fault for their presence in this country, whether it be lawful or unlawful.[45]

The citizen children of the members of the plaintiff class, however, like the alien children in *Plyler*, are not comparably situated to their alien mothers. While their alien mothers "have the ability to conform their conduct to societal norms" and presumably the ability to remove themselves from this country, the citizen children of the members of the plaintiff class " 'can neither affect their [mothers'] conduct' " nor alter their mothers' immigration status. *Plyler*, 457 U.S. at 220, 102 S.Ct. 2382 (quoting *Trimble v. Gordon*, 430 U.S. 762, 770, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977)). Yet the Secretary's application of Section 401(a) of the Welfare Reform Act to deny their alien mothers Medicaid-sponsored prenatal care results in the imposition of a discriminatory burden on these newborn citizen children on the sole basis of a characteristic over which they have no control—the immigration status of their mothers. As discussed above, the Secretary's application of Section 401(a) to deny Medicaid for routine prenatal care to their alien mothers operates to deny these newborn innocent citizen children automatic eligibility for Medicaid on the sole basis of the immigration status of their mother. Moreover, the ultimate result of the Secretary's denial of such prenatal care is the imposition of severe and potentially lifelong physical and mental disabilities on these innocent citizen children on account of the conduct and status of their mothers.

The Supreme Court has repeatedly recognized that "[l]egislation directing the onus of a parent's misconduct against his children does not comport with fundamental conceptions of justice." *Plyler*, 457 U.S. at 220, 102 S.Ct. 2382; *see also Jimenez v. Weinberger*, 417 U.S. 628, 632, 94 S.Ct. 2496, 41 L.Ed.2d 363 (1974); *Weber v. Aetna Casualty & Surety Co.*, 406 U.S. 164, 175, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972).

> [V]isiting ... condemnation on the head of an infant is illogical and unjust. Moreover, imposing disabilities on the ... child is contrary to the basic concept of our system of justice that legal burdens should bear some relationship to individual responsibility or wrongdoing. Obviously, no child is responsible for his birth and penalizing the ... child is an ineffectual—as well as an unjust—way of deterring the parent.

*Weber*, 406 U.S. at 175, 92 S.Ct. 1400 (footnote omitted); *see also Pickett v. Brown*, 462 U.S. 1, 7–8, 103 S.Ct. 2199, 76 L.Ed.2d 372 (1983) (quoting *Weber* ); *Plyler*, 457 U.S. at 220, 102 S.Ct. 2382 (same); *Parham v. Hughes*, 441 U.S. 347, 352–53, 99 S.Ct. 1742, 60 L.Ed.2d 269 (1979) (same); *Trimble v. Gordon*, 430 U.S. 762, 769–70, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977) (same); *Mathews v. Lucas*, 427 U.S. 495, 505, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976) (same); *Jimenez*, 417 U.S. at 632, 94 S.Ct. 2496 (same); *New Jersey Welfare Rights Org. v. Cahill*, 411 U.S. 619, 620, 93 S.Ct. 1700, 36 L.Ed.2d 543 (1973) (same).

In *Plyler*, the Supreme Court relied upon this rationale to hold that a Texas law that withheld state funds from local school districts for the education of undocumented alien children and permitted local

---

**44.** The federal defendant's arguments that *Plyler* is inapplicable because it concerned a state, rather than a federal, alienage classification are addressed *infra*.

**45.** *Cf. Plyler*, 457 U.S. at 220, 102 S.Ct. 2382 ("At the least, those who elect to enter our territory by stealth and in violation of our law should be prepared to bear the consequences, including, but not limited to, deportation. But the children of those illegal entrants are not comparably situated.").

school districts to deny enrollment to those children violated the Equal Protection Clause of the Fourteenth Amendment. The Court in *Plyler* applied a heightened level of scrutiny rather than the traditional rational basis test, finding that the state's legislative classification could not "be considered rational unless it furthers some substantial goal of the State." *Plyler*, 457 U.S. at 224, 102 S.Ct. 2382. Before selecting this intermediate level of judicial scrutiny, Justice Brennan wrote for the majority of the Court:

> Undocumented aliens cannot be treated as a suspect class because their presence in this country in violation of federal law is not a "constitutional irrelevancy." Nor is education a fundamental right; a State need not justify by compelling necessity every variation in the manner in which education is provided to its population. But more is involved in these cases than the abstract question whether § 21.031 discriminates against a suspect class, or whether education is a fundamental right. Section 21.031 imposes a lifetime hardship on a discrete class of children not accountable for their disabling status.

*Plyler*, 457 U.S. at 223, 102 S.Ct. 2382.

The Court's explicit adoption of heightened scrutiny in *Plyler* is notable because the Court had theretofore only expressly adopted the language of heightened scrutiny where a suspect class was involved or a fundamental right at stake.[46] Writing in dissent, Chief Justice Burger found the majority's adoption of a heightened standard of review unsupported by the Court's equal protection jurisprudence: "Once it is conceded—as the Court does—that illegal aliens are not a suspect class, and that education is not a fundamental right, our inquiry should focus on and be limited to whether the legislative classification at issue bears a rational relationship to a legitimate state purpose." *Plyler*, 457 U.S. at 248, 102 S.Ct. 2382 (Burger, C.J., dissenting).

The Court's adoption of a heightened standard of review in *Plyler*, however, accords with the long line of cases in which the Court has subjected federal and state legislative classifications that impose disabilities on innocent children on the sole basis of the conduct of their parents to more rigorous judicial review. In the vast majority of these cases, the Court has considered and struck down as unconstitutional legislative classifications that impose disabilities on illegitimate children on the sole basis of their illegitimate status. *See Clark v. Jeter*, 486 U.S. 456, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988) (striking down as unconstitutional a Pennsylvania six-year statute of limitations on paternity suits brought on behalf of illegitimate children); *Pickett v. Brown*, 462 U.S. 1, 103 S.Ct. 2199, 76 L.Ed.2d 372 (1983) (striking down as unconstitutional a Tennessee two-year statute of limitations on paternity suits brought on behalf of certain illegitimate children); *Mills v. Habluetzel*, 456 U.S. 91, 102 S.Ct. 1549, 71 L.Ed.2d 770 (1982) (striking down as unconstitutional a Texas one-year statute of limitations on paternity suits brought on behalf of illegitimate children); *Trimble v. Gordon*, 430 U.S. 762, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977) (striking down as unconstitutional an Illinois statute which allowed illegitimate children to inherit by intestate succession only from their mothers, not their fathers); *Jimenez v. Weinberger*, 417 U.S. 628, 94 S.Ct. 2496, 41 L.Ed.2d 363 (1974) (striking down as unconstitutional a federal legislative classification in the Social Security Act that imposed onerous restrictions on the ability of certain illegitimate

---

**46.** *See* Max Stier, Note, *Corruption of Blood and Equal Protection: Why the Sins of the Parents Should Not Matter*, 44 Stan.L.Rev. 727, 745 (1992) ("What makes *Plyler* unusual is that although, historically, the Court sometimes has claimed to use a simple rationality test while really engaging in more rigorous judicial review, the Court had never, before *Plyler*, adopted the language of heightened scrutiny without there being a suspect class involved or a fundamental right at stake.").

children to recover insurance benefits after one of their parents became disabled); *New Jersey Welfare Rights Org. v. Cahill,* 411 U.S. 619, 93 S.Ct. 1700, 36 L.Ed.2d 543 (1973) (striking down as unconstitutional New Jersey statute limiting eligibility for benefits under "Assistance to Families of the Working Poor" program, the practical effect of which was to deny benefits to illegitimate children while granting them to legitimate children); *Gomez v. Perez,* 409 U.S. 535, 93 S.Ct. 872, 35 L.Ed.2d 56 (1973) (holding that once a state "posits a judicially enforceable right on behalf of children to needed support from their natural fathers there is no constitutionally sufficient justification for denying such an essential right to a child simply because its natural father has not married its mother"); *Weber v. Aetna Casualty & Surety Co.,* 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972) (striking down as unconstitutional a Louisiana statute that denied workers compensation benefits to dependent, but unacknowledged, illegitimate children); *Levy v. Louisiana,* 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968) (holding that state may not create a right of action in favor of children for the wrongful death of a parent and exclude illegitimate children from the benefit of such a right); *see also King v. Smith,* 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968) (striking down Alabama regulation that denied AFDC benefits to children of mother who "cohabits" with man to whom she is unmarried as invalid under Social Security Act).

In these cases, the Court has recognized that the legal status of illegitimacy, like race or national origin, is an immutable characteristic which "bears no relation to the individual's ability to participate in and contribute to society," [47] *Mathews,* 427 U.S. at 505, 96 S.Ct. 2755, and that "the law has long placed the illegitimate child in an inferior position relative to the legitimate in certain circumstances," *id.* at 505–06, 96 S.Ct. 2755. Nonetheless, the Court has said that classifications based on illegitimacy are not "suspect" or subject to strict scrutiny.[48] *Pickett,* 462 U.S. at 8, 103 S.Ct. 2199; *Trimble,* 430 U.S. at 767, 97 S.Ct. 1459; *Mathews,* 427 U.S. at 506, 96 S.Ct. 2755; *Labine,* 401 U.S. at 532, 91 S.Ct. 1017.

The Court has, however, consistently applied heightened scrutiny to legislative classifications based on illegitimacy. *See, e.g., Clark,* 486 U.S. at 456, 108 S.Ct. 1910; *Pickett,* 462 U.S. at 1, 103 S.Ct. 2199; *Mills,* 456 U.S. at 91, 102 S.Ct. 1549; *Trimble,* 430 U.S. at 762, 97 S.Ct. 1459; *Jimenez,* 417 U.S. at 628, 94 S.Ct. 2496;

---

**47.** *Cf. Frontiero v. Richardson,* 411 U.S. 677, 686, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) (plurality opinion) ("[S]ince sex, like race and national origin, is an immutable characteristic determined solely by the accident of birth, the imposition of special disabilities upon the members of a particular sex because of their sex would seem to violate the basic concept of our system that legal burdens should bear some relationship to individual responsibility...."); *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 446–50, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (refusing to recognize the mentally disabled as a "quasi-suspect class" entitled to heightened scrutiny, but striking down zoning ordinance requiring special use permit for homes for the mentally disabled as not rationally related to any legitimate governmental purpose).

**48.** In *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), the Court identified a "suspect class" entitled to the protections of strict judicial scrutiny as one "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *Id.* at 28, 93 S.Ct. 1278; *see also United States v. Carolene Prods. Co.,* 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938).

The Court has observed, "perhaps in part because the roots of the discrimination rest in the conduct of the parents rather than the child, and perhaps in part because illegitimacy does not carry an obvious badge, as race or sex do, this discrimination against illegitimates has never approached the severity or pervasiveness of the historic legal and political discrimination against women and Negroes." *Mathews,* 427 U.S. at 506, 96 S.Ct. 2755 (footnote omitted).

*New Jersey Welfare Rights Org.*, 411 U.S. at 619, 93 S.Ct. 1700; *Gomez*, 409 U.S. at 535, 93 S.Ct. 872; *Weber*, 406 U.S. at 164, 92 S.Ct. 1400; *see also Trimble*, 430 U.S. at 781, 97 S.Ct. 1459 (Rehnquist, J., dissenting) (citing majority opinions that include language suggesting that illegitimacy classifications "will receive a more far-reaching scrutiny under the Equal Protection Clause than will other laws regulating economic and social conditions").[49] In more recent cases, the Court has explicitly stated that illegitimacy classifications are subject to an intermediate level of scrutiny. *See, e.g., Clark*, 486 U.S. at 461, 108 S.Ct. 1910; *Pickett*, 462 U.S. at 8, 103 S.Ct. 2199; *Mills*, 456 U.S. at 99, 102 S.Ct. 1549; *Lalli v. Lalli*, 439 U.S. 259, 265, 99 S.Ct. 518, 58 L.Ed.2d 503 (1978) (plurality opinion); *see also Trimble*, 430 U.S. at 767, 97 S.Ct. 1459.

In finding heightened scrutiny appropriate, the Court has repeatedly emphasized Justice Powell's observation in *Weber* that imposing disabilities on the illegitimate child on the basis of the sins of the parent "is illogical and unjust" and "contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing." *Weber*, 406 U.S. at 175, 92 S.Ct. 1400; *see, e.g., Clark*, 486 U.S. at 461, 108 S.Ct. 1910 ("[W]e have invalidated classifications that burden illegitimate children for the sake of punishing the illicit relations of their parents, because 'visiting this condemnation on the head of an infant is illogical and unjust.'"); *Pickett*, 462 U.S. at 7–8, 103 S.Ct. 2199 (noting that the Court's consideration of the constitutional validity of statutory classifications based on illegitimacy "has been animated by a special concern for discrimination against illegitimate children," and quoting *Weber*); *Mills*, 456 U.S. at 101 n. 8, 102 S.Ct. 1549 ("[W]e have repeatedly held that 'imposing disabilities on the illegitimate child is contrary to the basic concept of our system that burdens should bear some relationship to individual responsibility or wrongdoing.'"); *Parham*, 441 U.S. at 352, 99 S.Ct. 1742 ("The basic rationale of these decisions is that it is unjust and ineffective for society to express its condemnation of procreating outside the marital relationship by punishing the illegitimate child who is in no way responsible for his situation and is unable to change it."); *Lalli*, 439 U.S. at 265, 99 S.Ct. 518; *Trimble*, 430 U.S. at 769–70, 97 S.Ct. 1459; *Mathews*, 427 U.S. at 505, 96 S.Ct. 2755.

As one commentator has persuasively argued, this notion that children should not be penalized for the sins of their parents, commonly referred to as "blood taint," is "deeply embedded" in the Constitution, most notably in the Framers' hostility to the archaic common law penalty of "corruption of the blood," a form of a bill of attainder.[50] Max Stier, Note, *Corruption of the Blood and Equal Protection: Why the Sins of the Parent Should Not Matter*, 44 Stan.L.Rev. 727, 729–39 (1992). This hostility to the corruption of the blood penalty finds its textual foundations in Article III, Section 3, Clause 2 of the Constitution, which provides: "The Congress shall have Power to declare the Punishment of Treason, but no Attainder of Treason shall work Corruption of Blood, or

---

49. In applying such heightened scrutiny, the Court has upheld the validity of those statutes where the classifications were "so precisely structured as to further a sufficiently adequate state interest." *Parham*, 441 U.S. at 352 n. 5, 99 S.Ct. 1742 (citing *Lalli*, 439 U.S. at 259, 99 S.Ct. 518; *Mathews*, 427 U.S. at 495, 96 S.Ct. 2755; *Labine*, 401 U.S. at 532, 91 S.Ct. 1017).

50. Corruption of the blood refers to the common law penalty that followed a finding of attainder or a judgment that a felony or treason had been committed. As a result of the penalty, an attainted person lost all property as well as the legal ability to inherit or pass on property to his heirs. The result of the corruption of the blood penalty, thus, was to preclude the children of an attained person from inheriting through, or inheriting from, their attainted parent. *See* Stier, Note, *supra*, at 729.

Forfeiture except during the Life of the Person attained." U.S. Const. art. III, § 3, cl. 2. This provision has been interpreted by the Framers, the Supreme Court, and commentators as " 'a declaration that the children should not bear the iniquity of the fathers.' " Stier, Note, *supra*, at 730–31 (quoting *Wallach v. Van Riswick*, 92 U.S. 202, 210, 23 L.Ed. 473 (1875)).

In addition, members of the Court have repeatedly acknowledged this principle. *See Korematsu v. United States*, 323 U.S. 214, 243, 65 S.Ct. 193, 89 L.Ed. 194 (1944) (Jackson, J., dissenting) ("[I]f any fundamental assumption underlies our system, it is that guilt is personal and not inheritable. Even if all of one's antecedents had been convicted of treason, the Constitution forbids its penalties to be visited upon him, for it provides that 'no Attainder of Treason shall work Corruption of Blood, or Forfeiture except during the Life of the Person attained.' "). Justice Douglas, in the context of arguing that the denial of AFDC benefits to children on the basis of the alleged immorality of the mother violated the Equal Protection Clause, observed in his concurring opinion in *King v. Smith*, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968), that "[t]his penalizing the children for the sins of their mother is reminiscent of the archaic corruption of the blood, a form of bill of attainder." *Id.* at 336 n. 5, 88 S.Ct. 2128 (Douglas, J., concurring).

In this case, the Secretary's application of Section 401(a) of the Welfare Reform Act to deny Medicaid benefits for routine prenatal care to unqualified pregnant aliens imposes a discriminatory burden on a class of innocent citizen children solely on the basis of the immigration status of their mothers. As a result of the Secretary's denial of such prenatal care, the citizen child of an unqualified alien mother is denied automatic eligibility for Medicaid, while the similarly situated citizen child of an otherwise qualified citizen mother is deemed automatically eligible for Medicaid. *See* 42 U.S.C. § 1396a(e)(4); 42 C.F.R. § 435.117. Moreover, the Secretary's denial of such prenatal care will result not only in the denial of automatic eligibility to these newborn citizen children but also in the imposition of severe and potentially lifelong birth defects on a significant number of these citizen children on account of the alienage of their mothers. Such discrimination against the citizen child on the basis of the alienage status of the mother "is reminiscent of the archaic corruption of the blood," *King*, 392 U.S. at 336 n. 5, 88 S.Ct. 2128 (Douglas, J., concurring), and "does not comport with fundamental conceptions of justice," *Plyler*, 457 U.S. at 219, 102 S.Ct. 2382.

Accordingly, I find it appropriate to apply a heightened or intermediate standard of scrutiny to the equal protection claims of the citizen children of the members of the plaintiff class.[51] Nor may the rationale

---

**51.** In *Doe v. Reivitz*, No. 85–C–793, slip. op. at 13–19 (E.D.Wis. July 22, 1986), *aff'd on other grounds*, 830 F.2d 1441 (7th Cir.1987), the district court considered whether the State of Wisconsin, pursuant to a policy promulgated by the Secretary, could deny AFDC benefits to otherwise eligible citizen children because the family's primary wage earner was an illegal alien. When considering the claims of the members of the plaintiff class of citizen children that the denial of AFDC benefits violated their Fifth Amendment equal protection rights, the district court in *Reivitz* applied a heightened or intermediate level of scrutiny under the rationale of *Plyler*. The district court reasoned that classification drawn by the Secretary's policy discriminated against a

class of innocent citizen children on the sole basis of the unlawful immigration status of their parents and, thus, under the standard set forth in *Plyler* could not be considered rational unless it furthers some substantial goal of the state. Applying such a heightened standard of review, the district court in *Reivitz* found that the federal and state defendants had failed to articulate such a substantial governmental objective which the classification was intended to further and rejected the proposed justifications of discouraging illegal immigration, discouraging the employment of illegal aliens, and discouraging welfare dependency. The district court noted the federal plenary power over immigration, but found it inapplicable because the legislation at issue

of *Plyler* be avoided here on the ground that this case, unlike *Plyler*, involves a challenge to a federal, rather than a state, alienage classification. To be sure, in considering the equal protection challenges brought by qualified aliens deemed ineligible for certain federal programs under Section 402 of the Welfare Reform Act, some lower federal courts have rejected arguments that *Plyler* requires the application of a heightened standard of review to those challenges. These courts have found *Plyler* distinguishable on the ground that it involved a state, rather than a federal, alienage classification and, thus, did not implicate Congress' plenary power over immigration. *See Rodriguez*, 983 F.Supp. at 1457; *Abreu*, 971 F.Supp. at 813.

The instant case, however, presents a situation very different from those presented by previous equal protection challenges to the constitutionality of Section 402 of the Welfare Reform Act. In this case, unlike the cases cited by the federal defendant, the class directly affected by the Secretary's application of the alienage classification in Section 401(a) of the Welfare Reform Act is not a class of aliens, but rather a class of otherwise eligible citizen children. *Cf. Doe v. Reivitz*, No. 85–C–793, slip. op. at 13–19 (E.D.Wis. July 22, 1986) ("The class directly affected by the classification is not a class of illegal aliens, but a class of otherwise eligible citizens."), *aff'd on other grounds*, 830 F.2d 1441 (7th Cir.1987).

The Supreme Court has seldom considered the constitutionality of a federal alienage classification that results primarily in harm to United States citizens. In *Fiallo v. Bell*, 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977), the Court considered a constitutional challenge to a provision of the Immigration and Nationality Act that permitted the illegitimate alien child of a United States citizen to seek a special preference immigration status by virtue of his relationship with his natural mother but not by virtue of his relationship with his natural father. The Court in *Fiallo* rejected the argument made by the plaintiffs and by Justices Marshall and Brennan in dissent that "more searching judicial scrutiny" should apply because the provision infringed upon the due process rights of United States citizens or implicated the fundamental constitutional interests of United States citizens in a familial relationship. *See id.* at 794–95, 97 S.Ct. 1473. The majority of the Court found such an argument unpersuasive because it rested upon the incorrect assumption that the Act granted to American citizens a "fundamental right" in the admission of certain aliens. *See id.* at 795 n. 6, 97 S.Ct. 1473. The Court went on to state that

the fallacy of the assumption is rooted deeply in fundamental principles of sovereignty.

We are dealing here with an exercise of the Nation's sovereign power to admit or exclude foreigners in accordance with perceived national interests....

As Mr. Justice Frankfurter wrote years ago, the formulation of these "[p]olicies pertaining to the entry of aliens ... is entrusted exclusively to Congress." *Galvan v. Press*, 347 U.S. at 531, 74 S.Ct. 737.... That is not to say ... that the Government's power in this area is never subject to judicial review. But our cases do make clear that despite the impact of these classifications on the interests of those already within our borders, congressional determinations

was "social welfare legislation, not an immigration law" and because the "class directly affected by the classification is not a class of illegal aliens, but a class of otherwise eligible citizens." *Reivitz*, slip. op. at 12. On appeal, the Seventh Circuit affirmed the district court's decision on statutory grounds and declined to address the portion of the district court's decision which held that the denial of AFDC benefits to otherwise eligible citizen children on the basis of their parents' immigration status violated the children's equal protection rights. *See Doe v. Reivitz*, 830 F.2d 1441, 1442 (7th Cir.1987), *as amended*, 842 F.2d 194 (7th Cir.1988).

such as this one are subject only to limited judicial review.

*Id.* (citations omitted). Similarly, in *Kleindienst v. Mandel*, 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972), the Court rejected the argument that it should apply a heightened standard of review to a challenge brought by United States citizens to the Attorney General's discretionary power under the Immigration and Nationality Act to deny a visa to Ernest E. Mandel, a Belgian journalist and Marxist theoretician who had been invited by American scholars and students to attend academic conferences in the United States. Mandel, as an alien who was a proponent of "the economic, international, and governmental doctrines of world communism," was ineligible to receive a visa under the Act absent a waiver by the Attorney General. The Court rejected the arguments of the citizen-appellees, the American scholars and students who had invited Mandel, that the Attorney General's denial of Mandel's request for a visa violated their First Amendment rights, recognizing that "plenary congressional power to make policies and rules for the exclusion of aliens has long been firmly established." *Id.* at 769–70, 92 S.Ct. 2576. The Court went on to hold that, "when the Executive exercises this power [to deny a waiver] on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests of those who seek personal communication with the applicant." *Id.* at 770, 92 S.Ct. 2576.

The instant case, however, is distinguishable from *Fiallo* and *Kleindienst* because, unlike those cases, the statutory provision at issue here does not directly relate to Congress' "broad power to determine which classes of aliens may lawfully enter the country." *Fiallo*, 430 U.S. at 794, 97 S.Ct. 1473.[52] Rather, the provision concerns the provision of welfare benefits to aliens and results in the denial of welfare benefits to United States citizens based upon the alienage status of their mothers. Moreover, the Secretary's application of the legislative classification at issue results in the disparate treatment of a class of citizens, rather than a class of aliens. Accordingly, the plenary federal power over immigration and naturalization does not require this Court to apply a deferential standard of review to the equal protection claims raised by the citizen children of the members of the plaintiff class.[53]

 In evaluating the equal protection claims raised by the members of the plaintiff class on their own behalf, however, it is clear that this Court may apply only a rational basis standard of review. Unlike their citizen children, the members of the plaintiff class present no claim that they are being discriminated against on the ba-

---

**52.** Unlike the plaintiffs in *Fiallo,* the citizen children of the members of the plaintiff class do not argue that the federal immigration statutes grant them any fundamental rights. Instead, they seek to assert their clearly established right to equal protection under the Fifth Amendment.

Moreover, the Supreme Court's decision in *Hampton v. Mow Sun Wong,* 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976), suggests that there are some limits on the federal plenary power over immigration. *See id.* at 103, 96 S.Ct. 1895 (because Civil Service Commission regulation deprived aliens of a liberty interest, "some judicial scrutiny of the deprivation is mandated by the Constitution.").

**53.** *But see Doe v. Wilson,* No. C–97–2427, 1997 WL 811788, at *2 (N.D.Cal. Dec.16, 1997) (noting, in the context of a challenge by a plaintiff class of immigrant women deemed ineligible for state-funded non-emergency prenatal care pursuant to Section 411(a) of the Welfare Reform Act to the constitutionality of Section 411(d) of the Welfare Reform Act, which allows states to override the alienage restriction in Section 411(a), that "plaintiffs do not challenge the constitutionality of section 411(a) [and] indeed, ... concede that under Congress' plenary power to regulate immigration, Congress could have chosen to prohibit the states entirely from providing benefits to undocumented immigrants," including state-sponsored non-emergency prenatal care).

sis of another's status or conduct. The members of the plaintiff class, unlike their citizen children, are responsible for their own immigration status. *Cf. Parham,* 441 U.S. at 353, 99 S.Ct. 1742 ("Unlike the illegitimate child for whom the status of illegitimacy is involuntary and immutable, the appellant here was responsible for fostering an illegitimate child and for failing to change its status."). Moreover, unlike their citizen children, the members of the plaintiff class, whether they entered this country lawfully or unlawfully, cannot "advance even a colorable constitutional claim to a share in" federal public welfare benefits. *Mathews,* 426 U.S. at 80, 96 S.Ct. 1883. Here, as in *Mathews,* the members of the plaintiff class claim that the Secretary's application of Section 401(a) of the Welfare Reform Act denies them the equal protection of the laws by discriminating among classes of aliens eligible for Medicaid benefits. Because restrictions upon the eligibility of aliens for federal welfare benefits fall within the plenary power doctrine, *see Mathews,* 426 U.S. at 81–83, 96 S.Ct. 1883, this Court must apply a deferential standard of review when considering the particular line that Congress has chosen to draw among categories of aliens eligible for those benefits, *see id.* at 83–84, 96 S.Ct. 1883. Accordingly, I must reject the claims that plaintiffs make on their own behalf because I cannot find that Congress' denial of prenatal care nor the distinctions drawn among classes of aliens lacks a rational basis.

### *Equal Protection Claims of Citizen Children*

█ I now turn to the merits of the claim raised by plaintiffs on behalf of their citizen children that the Secretary's application of the alienage classification in Section 401(a) of the Welfare Reform Act to deny their alien mothers Medicaid coverage for routine prenatal care violates their Fifth Amendment equal protection rights. To withstand intermediate or heightened scrutiny, the Secretary's application of the alienage classification in Section 401(a)

must be substantially related to a legitimate congressional objective. *See Clark v. Jeter,* 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988); *Pickett v. Brown,* 462 U.S. 1, 103 S.Ct. 2199, 76 L.Ed.2d 372, (1983); *Plyler,* 457 U.S. at 223–24, 102 S.Ct. 2382; *Mills v. Habluetzel,* 456 U.S. 91, 99, 102 S.Ct. 1549, 71 L.Ed.2d 770 (1982).

In evaluating the constitutionality of the Secretary's application of the alienage classification in Section 401(a) to deny Medicaid coverage for prenatal care under the standard of intermediate scrutiny, this Court may "appropriately take into account its costs to the Nation and to the innocent children who are its victims." *Plyler,* 457 U.S. at 223–24, 102 S.Ct. 2382. Here, as with the legislative classification at issue in *Plyler,* the Secretary's denial of Medicaid benefits for routine prenatal care for unqualified pregnant aliens "imposes a lifetime hardship on a discrete class of children not accountable for their disabling status." *Id.* The Secretary's denial of routine prenatal care will result in the imposition of severe and potentially lifelong mental and physical disabilities on a substantial number of the citizen children of the members of the plaintiff class. These physical and mental disabilities will handicap these innocent children for some substantial portion if not all of their lives and will pose significant obstacles to their abilities to accomplish their individual goals, as well as their abilities to "be self-reliant and self-sufficient participants in society." *Id.* at 221–22, 102 S.Ct. 2382 (citing *Wisconsin v. Yoder,* 406 U.S. 205, 221, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972)). Not only will these citizen children suffer for themselves, but the burden of caring for these children will impose significant social and economic costs on their families and our Nation. Accordingly, the Secretary's denial of Medicaid benefits for routine prenatal care must not only be substantially related to a legitimate congressional objective, but it must further "some sub-

stantial goal" in comparison to its costs to the Nation and to the innocent citizen children it burdens with a lifetime of hardship.[54] *Plyler*, 457 U.S. at 224, 102 S.Ct. 2382.

The Secretary's denial of Medicaid benefits for routine prenatal care to unqualified pregnant aliens pursuant to the alienage restriction in Section 401(a) of the Welfare Reform Act is unconstitutional under this standard.

The federal defendant argues that the Secretary's denial of Medicaid for routine prenatal care is substantially related to the

legitimate congressional objectives set forth in Section 400 of the Welfare Reform Act. Section 400, codified at 8 U.S.C. § 1601, reads, in pertinent part:

The Congress makes the following statements concerning national policy with respect to welfare and immigration:

(1) Self-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes.

(2) It continues to be the immigration policy of the United States that—

---

**54.** The federal defendant argues that plaintiffs may not base their constitutional challenge to the Welfare Reform Act on harm that is caused to another. As discussed above, however, the equal protection claims raised by plaintiffs on their own behalf and on behalf of their born citizen children are based upon the concrete injuries suffered by the members of the plaintiff class and by their born citizen children. Because plaintiffs have standing to bring an equal protection claim on their own behalf and have third-party standing to bring an equal protection claim on behalf of their born citizen children, this Court may consider the wider impact of the harm caused by the Secretary's denial of Medicaid benefits for routine prenatal care.

The Supreme Court has considered the harm inflicted upon parties not before the court when considering equal protection challenges. In *Weinberger v. Wiesenfeld*, 420 U.S. 636, 651–52, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975), the Court considered a father's claim that a provision of the Social Security Act that allowed mothers, but not fathers, with dependent children to recover social security survivors benefits violated his Fifth Amendment right to equal protection. The Court first found that Congress' purpose in providing survivorship benefits was to permit the surviving parent to remain at home to care for any minor children. Given that purpose, the Court found that gender-based distinction of the statutory provision was "entirely irrational" because the "classification discriminates among surviving children solely on the basis of the sex of the surviving parent." *Id.* at 650, 95 S.Ct. 1225. The Court went on to find that "[i]t is no less important for a child to be cared for by its sole surviving parent when that parent is male rather than female." *Id.* Thus, in considering the provision's rationality, the Court considered the interests of individuals who were not before the court but who were the intended beneficiaries of the

statute. Similarly, in *Plyler*, the Court considered the costs to the nation when determining the rationality of the Texas statute at issue. *Plyler*, 457 U.S. at 223–24, 102 S.Ct. 2382. The Court first found that in addition to benefitting the individual student, public education "has a fundamental role in maintaining the fabric of our society" and "our basic institutions." *Id.* at 221, 102 S.Ct. 2382. ("We have recognized 'the public schools as a most vital civic institution for the preservation of a democratic system of government.' "). Because of "the pivotal role of education" in our society, the Court stated "[w]e cannot ignore the significant social costs borne by our Nation when select groups are denied the means to absorb the values and skills upon which our social order rests." *Id.*

Here, the provision of routine prenatal care is vital to ensuring the health of children in this country. Although prenatal care is provided through the mother, it is clear that prenatal care is provided principally for the benefit of the fetus. It is beyond dispute that the denial of routine prenatal care will result in increased rates of infant mortality and low birth weight, as well as increased likelihood of other severe birth defects. The nation will be forced to bear the significant medical costs of caring for these citizen children after their birth. (Minkoff Aff. ¶ 38.) Moreover, of those children who survive, many will be denied the opportunity to lead productive or fulfilling lives in this country as a result of handicaps related to the birth defects they will sustain and, as a result, will be forced to depend upon a variety of social welfare programs. The cost to the nation of denying Medicaid benefits for routine prenatal care, thus, are substantial and beyond dispute. Accordingly, following the reasoning of *Weinberger* and *Plyler*, this Court may take those costs into account when considering plaintiffs' constitutional challenges.

(A) aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations, and

(B) the availability of public benefits not constitute an incentive for immigration to the United States.

(3) Despite the principle of self-sufficiency, aliens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates.

(4) Current eligibility rates for public assistance and unenforceable financial support agreements have proved wholly incapable of assuring that individual aliens not burden the public benefits system.

(5) It is a compelling government interest to enact new rules for eligibility and sponsorship agreements in order to assure that aliens be self-reliant in accordance with national immigration policy.

(6) It is a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits. . . .

Welfare Reform Act § 400, 110 Stat. 2105, 2260 (codified at 8 U.S.C. § 1601).

The federal defendant first argues that the Secretary's application of Section 401(a) to deny Medicaid for routine prenatal care to unqualified pregnant aliens furthers "the compelling government interest [in] remov[ing] the incentive for illegal immigration provided by the availability of public welfare benefits." 8 U.S.C. § 1601(6). It argues that the Secretary's denial of Medicaid for routine prenatal care encourages a pregnant alien to leave this country while pregnant, if she is already here, or to not enter this country in the first place.

While the removal of incentives for illegal immigration may be a legitimate congressional objective, this Court is unable to find that the denial of Medicaid benefits for routine prenatal care is "substantially related" to that objective. The federal defendant's argument that the availability of Medicaid benefits for routine prenatal care or lack thereof is a substantial factor in controlling illegal immigration is, to be generous, "highly speculative." *Cf. Lewis IV-A*, 965 F.2d at 1214. The proposition that there exists any substantial number of alien women who are simultaneously pregnant or contemplating pregnancy and, at the same time, deciding whether or not to enter or remain in this country illegally is one capable of being established or refuted by proof; yet, no evidence on this subject has been forthcoming during the long history of this litigation. But even assuming the existence of some substantial number of such individuals, there is no evidence or even plausible argument that, in the mixture of factors that presumably play a part in the decision-making process, the availability of prenatal care plays any significant role in deciding whether any given individual will decide to enter or remain in this country illegally. As the Supreme Court observed in *Plyler*, the dominant incentive for illegal entry in most states is the availability of employment. *See Plyler*, 457 U.S. at 228 & n. 24, 102 S.Ct. 2382.

On the other hand, weighed against the slight possibility that there may exist some alien women who are pregnant or contemplating pregnancy who will in fact take into account and be encouraged or deterred from illegal immigration by the availability or lack of prenatal care benefits is the devastating impact on very substantial numbers of U.S. citizen children as a result of the much more plausible scenario that large numbers of illegal alien women will find themselves pregnant in this country and unable or unwilling to leave despite the unavailability of prenatal care.

The federal defendant also argues that the Secretary's application of the alienage classification in Section 401(a) to deny Medicaid for routine prenatal care furthers

the "compelling government interest" in assuring that aliens are self-sufficient and do not depend on the public benefits system to meet their needs. 8 U.S.C. § 1601(1), (2)(A), (5). Again, ensuring the self-sufficiency of aliens in this Country is a legitimate congressional purpose. It is clear, however, that the Secretary's application of Section 401(a) to deny Medicaid benefits for routine prenatal care is not substantially related to that objective. The majority of the pregnant aliens who would be denied Medicaid benefits for routine prenatal care pursuant to Section 401(a) are categorically needy individuals " 'who earn no more than that necessary to cover the necessities of life.' " *Lewis IV–A,* 965 F.2d at 1208 (quoting *Lewis III,* 663 F.Supp. at 1174). By definition, the majority of these pregnant aliens are unable to afford the costs of privately sponsored routine prenatal care. Moreover, it is not disputed that a substantial number of the children of these unqualified alien women will suffer from low-birth weight or severe and potentially lifelong birth defects. Even if these children, as citizens, were able to apply for and eventually receive Medicaid assistance in their own names, the social, economic, and psychological burdens of caring for these disabled children will "demand such time and resources from [these alien women] as to prevent them from leading economically productive lives." *Lewis IV,* 794 F.Supp. at 1202.[55] Accordingly, the denial of Medicaid benefits for routine prenatal care is not substantially related to the objective of encouraging unqualified pregnant aliens to be self-sufficient.

Finally, the Secretary's application of Section 401(a) to deny Medicaid for routine prenatal care to unqualified aliens is not substantially related to the legitimate congressional objective of curbing expenditures. It is again undisputed that routine prenatal care is more cost-effective than treating preventable birth defects and low birth weight after a child's birth. As discussed above, recent studies have shown that between $2 and $10 can be saved in medical care costs for every dollar spent in providing routine prenatal care. (Minkoff Aff. ¶ 42.) Moreover, New York State estimates that the expenditure of $15.5 million on prenatal care for undocumented alien women saves an estimated $14.7 million in the costs of providing initial hospitalization for low-birth weight babies, not even including the substantial costs of providing lifelong medical care and special education for children born with severe birth defects. (Minkoff Aff. ¶¶ 39 & 40.)

The substantial and known costs to the individual citizen children of the members of the plaintiff class, to New York State, and to this nation of the Secretary's denial of Medicaid benefits for routine prenatal care to unqualified pregnant aliens thus far outweigh the speculative benefits on which the federal defendant relies. When weighed against these costs, the purposes purportedly served by the Secretary's application of Section 401(a) to deny such prenatal care are "wholly insubstantial." Accordingly, I find that the Secretary's application of the alienage classification in Section 401(a) of the Welfare Reform Act to deny Medicaid for routine prenatal care to unqualified aliens denies the citizen chil-

---

**55.** In *Lewis IV,* I cited the findings of sociologist William Julius Wilson in support of this point. *See Lewis IV,* 794 F.Supp. at 1202–03. Wilson has noted:

> For the overwhelmingly female-headed ghetto underclass families, access to quality child care becomes a critical issue if steps are taken to move single mothers into education and training programs and/or full- or part-time employment.

W.J. Wilson, The Truly Disadvantaged, 153–54 (1987). If the care of healthy children can create such obstacles to employment for these women, care of children handicapped as a result of birth defects will only compound the problem:

> [A]s long as some poor families are unable to work because of physical or other disabilities, public assistance would be needed even if the government adopted a program of welfare reform that included child support enforcement and family allowance provisions.

*Id.* at 154.

dren of the members of the plaintiff class the equal protection of the laws and, thus, violates the Fifth Amendment's Due Process Clause.

*Severability*

Section 433(c) of the Welfare Reform Act, 8 U.S.C. § 1643(c), provides that, "[i]f any provision of this title or the application of such provision to any person or circumstance is held to be unconstitutional, the remainder of this title and the applications of the provisions of such to any person or circumstance shall not be affected thereby." Accordingly, this Court's decision affects only the Secretary's application of Section 401(a) of the Welfare Reform Act to the provision of Medicaid benefits for non-emergency prenatal care to unqualified aliens.

Because the Secretary's application of the alien eligibility restriction in Section 401(a) of the Welfare Reform Act to deny Medicaid coverage for routine prenatal care to unqualified pregnant aliens violates the Due Process Clause of the Fifth Amendment, the federal defendant's motion for judgment on the pleadings vacating the permanent injunction issued by this Court on March 14, 1991, is denied.

The Clerk is directed to furnish a filed copy of the within to all parties.

SO ORDERED.